FRANK DAVENPORT, *ET AL.*, PLAINTIFFS-RESPONDENTS, v. APPORTIONMENT COMMISSION OF THE STATE OF NEW JERSEY AND ROBERT M. FALCEY, ACTING SECRETARY OF THE STATE OF NEW JERSEY, DEFENDANTS-APPELLANTS.

Argued February 19, 20, 1974—Decided May 23, 1974.

126 

*Mr. David J. Goldberg* and *Mr. William Miller* argued the cause for appellant Apportionment Commission of New Jersey.

*Mr. Henry Ramer* argued the cause for respondents Davenport, *et al.*

*Mr. Donald L. Berlin* argued the cause for respondents Hummel, *et al* (*Messrs. Lieb, Teich and Berlin,* attorneys).

*Mr. Alfred J. Lechner, Jr.,* argued the cause for respondent Dietz.

*Mr. Walter F. Hoffman* argued the cause for *amicus curiae* Mazzacca.

The opinion of the Court was delivered by

SULLIVAN, J. In our opinion in *Davenport v. App. Comm., N. J.,* 63 *N. J.* 433 (1973) (hereinafter *Davenport I*) we had occasion to consider the same plan for apportionment of the State Legislature as is now before us. The plan was prepared by the Apportionment Commission following our decision in *Scrimminger v. Sherwin,* 60 *N. J.* 483 (1972) in which, *inter alia,* we held that Senate districts should be

created without regard to the county-line theme of the State Constitution.

The *Scrimminger* mandate to disregard county lines was bottomed on the United States Supreme Court decisions in *Whitcomb v. Chavis,* 403 *U. S.* 124, 91 S. Ct. 1858, 29 *L. Ed.* 2d 363 (1971); *Abate v. Mundt,* 403 *U. S.* 182, 91 S. Ct. 1904, 29 *L. Ed.* 2d 399 (1971) and *Connor v. Williams,* 404 *U. S.* 549, 92 S. Ct. 656, 30 *L. Ed.* 2d 704 (1972) holding that substantial equality of population among legislative districts was the overriding object of the one-man, one-vote principle.

The trial court approved the new plan with a slight modification not here involved. However, on appeal the Appellate Division held, 124 *N. J. Super.* 30 (1973), that the recent opinion of the United States Supreme Court in *Mahan v. Howell,* 410 *U. S.* 315, 93 S. Ct. 979, 35 *L. Ed.* 2d 320 (1973), handed down after our decision in *Scrimminger,* had given new dimensions to the one-man, one-vote principle by permitting some deviation from absolute equality of population among election districts where effectuation of a State policy of maintenance of the integrity of political subdivision lines was involved.

After noting that in this State the county had always been a traditional political subdivision and that its citizens had a community of interest in governmental matters, the Appellate Division concluded that the trend towards absolute population equality in creating legislative districts had been significantly modified by *Mahan,* and that this Court might not abide by *Scrimminger* insofar as it required the Commission to create districts without regard to county lines. The Appellate Division conceived that in the light of *Mahan* this Court might well hold that under our State Constitution county lines should be respected as far as possible.

In *Davenport I* we held that *Mahan* and subsequently decided cases, *Gaffney v. Cummings,* 412 *U. S.* 735, 93 S. Ct. 2321, 37 *L. Ed.* 2d 298 (1973); *White v. Regester,* 412 *U. S.* 755, 93 S. Ct. 2332, 37 *L. Ed.* 2d 314 (1973), and

*White v. Weiser,* 412 *U. S.* 783, 93 S. Ct. 2348, 37 *L. Ed. 2d* 335 (1973), did not undercut our holding in *Scrimminger* that under the demographic pattern of the 1970 census there must be 40 individual Senate districts drawn necessarily without regard to the "whole county" theme of the State Constitution. However, we emphasized that when we spoke of "adherence to county lines" in *Scrimminger* we used that expression as the equivalent of adhering to the whole county in setting up the Senate districts, and did not have in mind adherence to less than all of the lines of a whole county. The Appellate Division opinion had projected this latter question as possibly required under our State Constitution.

We noted two constitutional provisions, Art. IV, § 2, ¶ 1 and Art. IV, § 2, ¶ 3, which might arguably support the thesis that there shall be placed within whole counties as many of the 40 Senate districts as can be, *i. e.,* adherence to less than all the lines of a county as distinct from adherence to a whole county. Decision was withheld on this issue with the following comment, 63 *N. J.* at 447–448:

In deciding whether the Constitution demands that result, it may be helpful to know how many districts can be placed within whole counties, at what deviations, and with what pluses and minuses as between the voters of Senate districts so placed and the voters of Senate districts not so placed.

The record is inadequate for a decision upon this issue. We assume that a series of plans could be prepared to indicate what results could be achieved and the deviations involved. The parties may file pertinent material within 30 days from the date this opinion is filed and briefs 30 days thereafter. Any party may move for additional directions. A date for further argument will be fixed. We of course do not disturb the Appellate Division's determination that the general election scheduled for this year may proceed under the plan prepared by the Commission.

Following our opinion, several of the litigants submitted supplemental material as an aid towards resolution of the problem. Counsel for the Commission presented a study made in an effort to demonstrate the effect of increasing the

number of districts placed within whole counties. This study compared the two plans previously submitted to the Court (the Commission plan and plaintiff Dorothea Hummel's plan) and reviewed the 650 Senate district maps prepared by the Commission prior to its certification of the Senate districts for use in the 1971 elections.

The comparison of the two plans in various aspects suggested that "the lower the population deviations, the fewer the number of districts lying wholly within a county will be." Review of the 650 Senate district maps revealed the same direct relationship between population deviation and the straddling of county lines.

However, the Commission did not understand that it was being asked to prepare any additional plan or plans. Consequently, when further argument in this matter was had, the only Commission plan before us was the same one we considered on June 4, 1973, the date of the *Davenport I* argument herein.

The present constitutional provisions of our legislative structure, ratified and adopted in 1966, provide in Art. IV, § 2, ¶ 1 that the Senate shall be composed of 40 Senators and that Senate districts shall be composed whenever practicable of one single county, and, if not so practicable, of two or more contiguous counties. Article IV, § 2, ¶ 3 provides that the General Assembly shall be composed of 80 members and that each Senate district to which only one Senator is appointed shall constitute an Assembly district, and that multi-Senator districts shall be divided into Assembly districts equal in number to the number of Senators apportioned to that Senate district.[1] The last sentence of paragraph 3 reads as follows:

---

[1]Mathematically this would call for 40 Assembly districts. Under Art. IV, § 2, ¶ 4 two members of the General Assembly shall be elected in each Assembly district.

\* \* \* Unless necessary to meet the foregoing requirements, no county or municipality shall be divided among Assembly districts unless it shall contain more than one-fortieth of the total number of inhabitants of the state, and no county or municipality shall be divided among a number of Assembly districts larger than one plus the whole number obtained by dividing the number of inhabitants in the county or municipality by one-fortieth of the total number of inhabitants of the State.

It is apparent that the foregoing contemplates the use of whole counties, either singly or in combination with other counties, as the building blocks of the legislative structure. This concept applies to both Senate and Assembly districts, although, as to the latter it is recognized that in dividing a multi-member Senate district into Assembly districts, the requirement of population equality may compel some division of larger counties and municipalities.

In *Scrimminger,* we decided that the foregoing State constitutional mandate with respect to using counties as building blocks could not be enforced under the demographic pattern revealed by the 1970 census. As a result, the districting structure called for by present Article IV has been declared to be in violation of the Federal Constitution under the one-man, one-vote principle.[2]

The question now presented is whether, although the whole-county concept must be abandoned, Article IV of the Constitution requires adherence to county lines to the extent possible, *i. e.,* placing as many Senate districts as possible within whole counties.

It is argued that since the county unit has always been considered a political entity in this State, with its citizens sharing a community of interest in governmental matters, as many Senate districts as possible should be placed within whole counties so as to preserve to the voters in the Senate districts so placed this community of interest. It is urged that such is mandated by our present constitutional language.

---

[2] New constitutional provisions for our State legislative structure would seem to be in order.

We find no such meaning in Article IV, nor do we think valid apportionment policy requires such result. On the contrary, we think it clear that attempting to preserve some semblance of county voting strength would create a plethora of constitutional problems. Were dilution of county voting strength a required consideration in applying one-man, one-vote, the degree of dilution would have to be considered and equalized along with population, a difficult if not impossible task to perform.

We are satisfied that once the use of counties as building blocks was declared unenforceable, as it had to be under the demographic pattern shown by the 1970 census, the county concept ceased to have any viability in the creation of Senate districts.

Aside from the county line issue which necessarily includes the contention that there has been an inordinate fragmentation of particular counties, plaintiffs argue that several of the districts established under the present plan are of the "shoestring" or "horseshoe" type and lack the element of compactness[3] which we held in *Scrimminger* still obtained as a requirement. It is charged that these odd-shaped districts were created solely for the purpose of protecting incumbent legislators.

Compactness is an elusive concept. We noted in *Scrimminger v. Sherwin, supra*, 60 *N. J.* at 498, that it may be of limited utility in creating legislative districts in the light of the odd configurations of our State and its municipalities. It has never been held to constitute an independent federal constitutional requirement for State legislative districts. *Gaffney v. Cummings, supra*, 412 *U. S.* at 752, 93 S. Ct. at 2331, 37 *L. Ed.* 2d at 312, footnote 18. This Court has suggested that population equality is distinctly paramount to it and that where districts are created

---

[3]Article IV, § 2, ¶ 3 provides that Assembly districts shall be "as nearly compact * * * as possible, * * *." There is no such requirement expressed as to Senate districts.

on the basis of existing political subdivisions, compactness becomes a much reduced factor. *Jackman v. Bodine,* 49 *N. J.* 406, 419 (1967).

█ Political considerations are inherent in districting. In *Gaffney v. Cummings, supra,* 412 *U. S.,* at 753, 93 S. Ct., at 2331, 37 *L. Ed.* 2d, at 312, the United States Supreme Court said:

> The very essence of districting is to produce a different — a more "politically fair" — result than would be reached with elections at large in which the winning party would take 100% of the legislative seats. Politics and political considerations are inseparable from districting and apportionment.

█ While the carving out of bizarrely-shaped districts for partisan advantage will not be tolerated, the creation of balanced political districts serves a valid apportionment purpose.

The Commission concedes that there is incorporated in its plan the concept of political balance. It states that this concept necessarily flows from the bipartisan and geographically diverse nature of the Commission and the resultant need to compromise in order to agree on a plan. Accordingly, its plan strikes a balance of "Republican" and "Democratic" districts, with minimization of contests between present incumbents being employed as part of the balancing process.

█ This concept of "political fairness" has been approved as a relevant factor which may be taken into consideration in state legislative districting. *Gaffney v. Cummings, supra.* While the Supreme Court in *Gaffney* was concerned with the scope of federal review of a state legislative district plan, it recognized that the apportionment task is primarily a political and legislative process and that districting inevitably has and is intended to have substantial political consequences.

█ No contention is made that the Commission plan does not strike a fair political balance. No issue of racial or minority representation is presented. It is conceded that pop-

ulation-wise the rate of deviation is extremely low. Aside from the alleged dilution of county voting strength, the only other attack made on it is the alleged lack of compactness of a few of the districts alleged to result from efforts to protect incumbents. It would appear that a plan with more compact districts could be prepared. However, that is not the only test to be applied here. Providing protection of incumbents serves a valid purpose and is a relevant factor to be taken into account in creating a legislative districting plan. *White v. Weiser, supra,* 412 *U. S.* at 797, 93 S. Ct. at 2355, 37 *L. Ed.* 2d at 347.

The judicial role in reviewing the validity of such a plan is limited. Reapportionment is essentially a political and legislative process. The plan must be accorded a presumption of legality with judicial intervention warranted only if some positive showing of invidious discriminaton or other constitutional deficiency is made. The judiciary is not justified in striking down a plan, otherwise valid, because a "better" one, in its opinion, could be drawn. *Gaffney v. Cummings, supra.*

We conclude that the Commission plan adequately carries out the mandate of *Scrimminger* and has not been shown to be in violation of any State or Federal constitutional standards. The overriding object of the one-man, one-vote principle is that there be substantial equality of population among the legislative districts so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State. The Commission plan with a range of deviation of 4.24% amply satisfies that standard. As was noted in *Davenport I,* we cannot order the Commission to produce a plan with increased deviations unless we find a positive violation of some legal mandate. We do not find any such violation to exist.

The judgment upholding the Commission plan with the slight modification not here involved is hereby affirmed. No costs.

PASHMAN, J. (dissenting). The majority, in selecting the present plan of the Apportionment Commission, has signified its desire to accept any configuration, no matter how oddly shaped, so long as the lowest possible percentage deviation can be attained. In so doing, they have sanctioned the breach of two positive constitutional mandates embodied within Article IV, § 2 of our State Constitution. The Commission, in drawing up and delineating boundaries for our State's 40 separate and distinct Senate districts, has neglected to follow in various instances existent county lines or heed the dictate of compactness. Art. IV, § 2[1] specifically states that:

---

[1]

Art. 4, § 2, ¶ 1:

The Senate shall be composed of forty senators apportioned among Senate districts as nearly as may be according to the number of their inhabitants as reported in the last preceding decennial census of the United States and according to the method of equal proportions. Each Senate district shall be composed, wherever practicable, of one single county, and, if not so practicable, of two or more contiguous whole counties.

Art. 4, § 2, ¶ 2:

Each senator shall be elected by the legally qualified voters of the Senate district, except that if the Senate district is composed of two or more counties and two senators are apportioned to the district, one senator shall be elected by the legally qualified voters of each Assembly district. Each senator shall be elected for a term beginning at noon of the second Tuesday in January next following his election and ending at noon of the second Tuesday in January four years thereafter, except that each senator, to be elected for a term beginning in January of the second year following the year in which a decennial census of the United States is taken, shall be elected for a term of two years.

Art. 4, § 2, ¶ 3:

The General Assembly shall be composed of eighty members. Each Senate district to which only one senator is apportioned shall constitute an Assembly district. Each of the remaining Senate districts shall be divided into Assembly districts equal in number to the number of senators apportioned to the Senate district. The Assembly districts shall be composed of contiguous territory, as nearly compact and equal in the number of their inhabitants as possible, and in no event shall each such district contain less than eighty per cent nor

1.

. . . Each Senate district shall be composed, wherever practicable, of one single county, and, if not so practicable, of two or more contiguous whole counties.

Chief Justice Weintraub in *Scrimminger v. Sherwin*, 60 *N. J.* 483 (1972), alluded to this as the "whole county" concept which he rejected as fraught with problems and inequities, thus effectively — or so it seemed — nullifying the above provision. The paramount concern at that time was to attain as nearly as possible the mathematical ideal of one-man, one-vote. With the help of some doubtful reasoning, my colleagues have concluded that the county concept, in whatever form, was declared unconstitutional in *Scrimminger, supra.* This is simply not the case. The county concept was never explicitly held to be unconstitutional. It was, however, pre-empted or superseded for a short period as being repugnant to the Equal Protection Clause of the United States Constitution. Since then the United States Supreme Court, in *Mahan v. Howell,* 410 *U. S.* 315, 93 *S. Ct.* 979, 35 *L. Ed. 2d* 320 (1973), has partially lifted the one-man, one-vote shroud from the face of our dormant State constitutional provision and has rejuvenated it. The Court in *Mahan, supra,* clearly backed away from its previous rigid and unyielding one-man, one-vote stance and permitted states a greater percentage deviation in redistricting if a rational state policy was effectuated. In accordance with this shift in attitude, Virginia was allowed to institute a legitimate and rational state policy of districting along county

more than one hundred twenty per cent of one-fortieth of the total number of inhabitants of the State as reported in the last preceding decennial census of the United States. Unless necessary to meet the foregoing requirements, no county or municipality shall be divided among Assembly districts unless it shall contain more than one-fortieth of the total number of inhabitants of the state, and no county or municipality shall be divided among a number of Assembly districts larger than one plus the whole number obtained by dividing the number of inhabitants in the county or municipality by one-fortieth of the total number of inhabitants of the State.

lines. The Court there accepted a 16.4% deviation from norm.

In a probable response to the then recent United States Supreme Court rulings, Chief Justice Weintraub also backed away from his stance in *Scrimminger, supra.* While concluding that the concept of moulding Senate districts around whole counties was untenable due to certain evils such as the multi-member districts, the Court was obviously looking for an avenue around the *Scrimminger* ruling to again retain some semblance of the county concept. The Court embraced a distinction in *Davenport v. App. Comm., N. J.,* 63 *N. J.* 433, 446 (1973) (hereinafter *Davenport I*), that what was discarded in *Scrimminger, supra,* was the "whole county" concept, but the "county line" concept remained unscathed. This Court, in suggesting such a distinction, was clearly trying to undo partially in *Davenport I, supra,* what had apparently been done in *Scrimminger, supra.* I respectfully submit that the majority, however, totally fails to deal with this problem. They, in turn, prefer to touch upon the issue and somehow to divine from *Scrimminger, supra,* that the county concept wes declared unconstitutional.

I believe that my brothers have been unnecessarily flexible with our constitutional mandates. It goes without question that the New Jersey Constitution is the supreme law of this State, representing the fundamental will of the people, upon which all other laws of this State repose. And our constitutional provisions must, of course, give way to the requirements of the Federal Constitution as construed by the United States Supreme Court. *Jackman v. Bodine,* 49 *N. J.* 406 (1967). *Marbury v. Madison,* 5 *U. S.* (1 Cranch) 137, 2 *L. Ed.* 60 (1803) declared that the United States Constitution could not be read so restrictively as to nullify or ignore any specific clause contained therein unless absolutely necessary. As this rule of construction applies to the United States Constitution, so does it apply to our State Constitution, except when the latter contravenes the former. Our Constitution is not to be read restrictively and technically, but broadly

and as a whole. It is this Court's duty to constantly endeavor to harmonize each ingredient, reevaluate each part, and rebalance the entirety in order to form a more cohesive and meaningful unity which is in tune with the spirit of the Constitution itself. *Gangemi v. Berry*, 25 *N. J.* 1 (1957); *State v. Lanza*, 27 *N. J.* 516 (1958), app. dismissed 358 *U. S.* 333, 79 *S. Ct.* 351, 3 *L. Ed. 2d* 350, rehearing denied 359 *U. S.* 932, 79 *S. Ct.* 606, 3 *L. Ed. 2d* 634 (1959); *Fischer v. Twp. of Bedminster*, 5 *N. J.* 534 (1950); *Wilentz v. Hendrickson*, 133 *N. J. Eq.* 447 (Ch. 1943), aff'd 135 *N. J. Eq.* 244 (E. & A. 1944); *Richman v. Ligham*, 22 *N. J.* 40 (1956); *Behnke v. New Jersey Highway Authority*, 13 *N. J.* 14 (1953); *John S. Westervelt's Sons v. Regency, Inc.*, 3 *N. J.* 472 (1950); *Murphy v. Zink*, 136 *N. J. L.* 235 (Sup. Ct. 1947), aff'd 136 *N. J. L.* 635 (E. & A. 1948).

Our Constitution is comprised of many, often times, overlapping provisions. The solution does not lie in ignoring the one while allowing the other provision full reign. Our Constitution is a balanced concept; while the balance may shift, it is not altered through the elimination of its variables.

These cases make it more than clear that a restrictive reading of our Constitution is impermissible, as is a complete abandonment of one of its provisions. The proper role for this Court is to reinterpret our Constitution in the light of recent developments and strike a new balance. My colleagues have refrained from reevaluating Art. IV, § 2 and in so doing have partially relinquished our primary judicial role. I believe that the majority, in so permitting any imaginable configuration of some of the 40 Senate districts, has not adhered to our Constitutional mandate embodied within Art. IV, § 2.

Founded upon this necessarily axiomatic determination that each constitutional provision must be recognized for a balanced and consistent conception of our Constitution to emerge, how are we to now interpret Art. IV, § 2? After *Scrimminger, supra,* the life blood of ¶¶ 1 and 2, referring to Senate redistricting within whole counties, seemed all but

drained. Chief Justice Weintraub was acutely cognizant of this situation and attempted to revitalize these two paragraphs in *Davenport I, supra* at 447 of 63 *N. J.*, where he hypothesized that ¶¶ 1 and 2 should be read in *pari materia* or as a whole with ¶ 3. He opined that this theory would make those requirements, applicable to Assembly districts, also obtain to Senate districts. This synthesis would not only give life to the "county line" concept as it applied to Senate districts, but would also raise the criterion of compactness to a constitutional level.

A construction of Art. IV, § 2 as an entirety in which virtually identical requirements apply to both Assembly and Senate districts has ample precedent in law and equity. This dissent subscribes to the construction which requires that one read the Constitution as a whole, thus warranting the applicability of identical provisions for both Senate and Assembly districting. Justice Heher succinctly stated this concept in *Fischer v. Twp. of Bedminster, supra,* 5 *N. J.* 541–542:

> There is, as has been said, no room for construction where the expression is plain and unambiguous, whether it be expressed in general or limited terms. Of course, the whole of the instrument is to be examined with a view to arriving at the true intention of each part. A clause of doubtful import in itself may be made plain by comparison with other clauses or provisions of the instrument.

The identical proposition was reflected in an earlier case, *Wilentz v. Hendrickson, supra,* 133 *N. J. Eq.* at 487, where Chancellor Jayne said:

> Courts should not gradually emasculate or whittle away the beneficent provisions of the supreme law. Constitutional provisions, protective and remedial in their nature, are not to be construed so stringently as to defeat the intended protection or remedy. Such regulatory provisions deemed to be of sufficient importance to the welfare of our government as to be incorporated in our constitution, must be interpreted to accomplish effectively and comprehensively the purposes for which they were introduced.

In reaffirming this concept, as it applies to Art. IV, § 2, I am retaining an age-old interpretive tradition which is strongly supported by this State's long history of recognizing the county concept. Justice Haneman, in his scholarly concurrence in *Jackman v. Bodine,* 43 *N. J.* 453, 479 (1964), indicated that the one Senator per county ideal or the utilization of counties as building blocks for Senate districts, is a concept older than the Republic itself. This State's 1966 Constitutional Convention obviously recognized this tradition when it unanimously passed for incorporation within Art. IV, § 2, Proposal No. 3, *i. e.,* ". . . legislative districts composed of whole counties and whole municipalities wherever practicable." *State of New Jersey Constitutional Convention of 1966, Digest of Proposals* (May 26, 1966). Such a legislative and judicial history should not be casually disregarded. In this vein, I see no reason for doing away with a concept viable up until two years ago when *Scrimminger, supra,* a case today in some respects of dubious import, purportedly dispensed with it. The end result, therefore, dictates that ¶¶ 1 and 2 not be totally destroyed, but be rearmed and revitalized by ¶ 3.

As a further, more practical consideration to this rather theoretical matter, for an Assembly district to properly conform to its requirements, the Senate districts, upon which the Assembly districts are constructed, must also conform. If the Senate districts fail to abide by the Assembly criteria, or are not required to do so by the majority, it is highly improbable that the Assembly districts themselves would pass constitutional muster. In addition, this Court in *Scrimminger v. Sherwin, supra,* 60 *N. J.* at 498, could not have considered municipalities appropriate building blocks for Senate districts if Art. IV, § 2 were not read in *pari materia* because municipalities are only mentioned in reference to Assembly districts. In the present case, the Apportionment Commission should follow as many county lines as possible, but where it is not possible, then municipal boundaries should be respected. Only if a municipality has a popula-

tion greater than one-fortieth of the total State population, should it be fragmented.

Ever since *Reynolds v. Sims,* 377 *U. S.* 533, 84 *S. Ct.* 1362, 12 *L. Ed.* 2d 506 (1964), the United States Supreme Court has been narrowing the acceptable percentage deviation in accordance with the one-man, one-vote ideal as it has been interpreted under the Equal Protection Clause. The trend in the 1960's and early 1970's marked a gradual yet steady decline in disparity, thereby achieving voting population equality. The following cases, where the population deviation was held unacceptable, are illustrative of this fact: 25.65% in the Florida Senate and 33.55% in the House, *Swann v. Adams,* 385 *U. S.* 440, 87 *S. Ct.* 569, 17 *L. Ed.* 2d 501 (1967); 26.48% in the Texas House, *Kilgarlin v. Hill,* 386 *U. S.* 120, 87 *S. Ct.* 820, 17 *L. Ed.* 2d 771 (1967); 28.20% in the Indiana Senate and 24.78% in the House, *Whitcomb v. Chavis,* 403 *U. S.* 124, 91 *S. Ct.* 1858, 29 *L. Ed.* 2d 363 (1971); and 18.9% in the Mississippi Senate and 19.7% in the House, *Connor v. Williams,* 404 *U. S.* 549, 92 *S. Ct.* 656, 30 *L. Ed.* 2d 704 (1972). A leveling point was found to rest at around 10% as Justice Brennan reckoned in his dissent in *White v. Regester,* 412 *U. S.* 755, 93 *S. Ct.* 2332, 37 *L. Ed.* 2d 314 (1973):

> * * * [O]ne can reasonably surmise that a line has been drawn at 10% — deviations in excess of that amount are apparently acceptable only on a showing of justification by the State; deviations less than that amount require no justification whatsoever. (412 U. S. at 777, 93 S. Ct. at 2345, 37 *L. Ed.* 2d at 331).

The reasons that prompted this statement lie in the following cases. In *Gaffney v. Cummings,* 412 *U. S.* 735, 93 *S. Ct.* 2321, 37 *L. Ed.* 2d 298 (1973), a Connecticut Senate diviation of 1.81% and an Assembly range of 7.83% were held not *prima facie* an invidious discrimination under the Equal Protection Clause. Nor was the 9.9% spread of the Texas legislature an impermissible range. *White v. Regester, supra.* In *Abate v. Mundt,* 403 *U. S.* 182, 91 *S. Ct.* 1904, 29 *L. Ed.*

*2d* 399 (1971), a total deviation of 11.9% was acceptable for apportioning a local county government. Finally, the case that has gone the furthest in permitting a deviation of 16.4% from norm and has precipitated the present re-examination in this State of the one-man, one-vote ideal, is *Mahan v. Howell,* 410 *U. S.* 315, 93 *S. Ct.* 979, 35 *L. Ed. 2d* 320 (1973). Mr. Justice Rehnquist, speaking for the Court, emphasized that if a state makes a good faith effort to effectuate a legitimate and rational state policy by redistricting along already existent political lines, the plan need only pass muster under the rational relationship test of the Equal Protection Clause, and not the compelling state interest test as the dissent advocated. Mr. Justice Rehnquist placed greater weight than the Court had in previous cases upon the value of counties, the services they perform, and the necessity of retaining them for the general benefit of the public. The community of interest analysis, having been recognized before, had lost importance under the one-man, one-vote doctrine, until it regained some of its former persuasive force in *Mahan v. Howell, supra.*

*Reynolds v. Sims, supra,* 377 *U. S.* 533, 580, 84 *S. Ct.* 1362, 1391, 12 *L. Ed. 2d* 506, 538, recognized this same community of interest argument under a similar rational relationship test as a legitimate reason for greater voting population deviation when the majority said:

A consideration that appears to be of more substance in justifying some deviations from population-based representation in state legislatures is that of insuring some voice to political subdivisions, as political subdivisions. Several factors make more than insubstantial claims that a State can rationally consider according political subdivisions some independent representation in at least one body of the state legislature, as long as the basic standard of equality of population among districts is mantained. Local governmental entities are frequently charged with various responsibilities incident to the operation of state government. In many States much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions. And a State may legitimately desire to construct districts along political subdivision lines to deter the possibilities of gerrymandering. * * *

This State has also realized the importance of treating citizens of the same county as a unified political group and the advantages gained thereby when Chief Justice Weintraub in *Jackman v. Bodine,* 43 *N. J.* 453, 462–463 (1964) stated:

\* \* \* The citizens of each county have a community of interest by virtue of their common responsibility to provide for public needs and their investment in the plants and facilities established to that end. Anciently, and still today, the counties reflect different economic interests, although of course these economic interests are not perfectly contained or separated by any political line, municipal, county or State. So, certain counties have a dominant concern with manufacturing and commerce; others have a large stake in agriculture; still others lean heavily upon the resort industry; and finally a few counties have a special interest in the products of the sea. And of course there may be competing area interests in such matters as highways, taxation, and water supply.

In a subsequent opinion, *Jackman v. Bodine,* 55 *N. J.* 371, 378 (1970), this Court again reaffirmed the community of interest concept when it said:

*Reynolds v. Sims* said there may be departures from mathematical equality in drawing district lines in order to maintain the integrity of political subdivisions because (1) adherence to such political lines may deter gerrymandering and (2) local government entities are frequently charged with various responsibilities incident to the operation of state government, and hence it is appropriate to provide a voice for that political community.

The advantage of adhering to county lines and retaining the county concept can readily be seen in the dramatic increase in county funding. For instance, county governments have involved themselves in many complex and traditionally local functions such as water pollution, traffic and transit, law enforcement, drainage, solid waste disposal, welfare programs, county vocational and special education, and others too numerous to mention. With each county becoming for particular purposes an economic unity, the benefits of legislators representing one county or a portion thereof are obvious.

As seen from the federal cases, the community of interest analysis, which was always a moving factor in this State until *Scrimminger, supra,* has rejoined the rational state policy arguments supporting a greater voting population deviation. While permitting a greater percentage deviation in state legislative redistricting, the rational state policy argument cannot, however, apply to the United States Congressional redistricting. *Kirkpatrick v. Priesler,* 394 *U. S.* 526, 89 *S. Ct.* 1225, 22 *L. Ed. 2d* 519 (1969); *Wells v. Rockefeller,* 394 *U. S.* 542, 89 *S. Ct.* 1234, 22 *L. Ed. 2d* 535 (1969); *Wesberry v. Sanders,* 376 *U. S.* 1, 84 *S. Ct.* 526, 11 *L. Ed. 2d* 481 (1964); *White v. Weiser,* 412 *U. S.* 783, 93 *S. Ct.* 2348, 37 *L. Ed. 2d* 335 (1973). The United States Supreme Court, after some doubt had arisen, reaffirmed in *Mahan v. Howell, supra,* that the more stringent Congressional standard was not applicable to state legislative redistricting.

Since *Mahan* and *Gaffney,* our county concept contained within Art. IV, § 2 has been afforded new breathing space. *Scrimminger v. Sherwin, supra,* was, however, written prior to the *Mahan* and *Gaffney* decisions and most properly reflects the overriding national policy of one-man, one-vote. Our Supreme Court followed the United States Supreme Court dictate that no excuse, not even — or so it seemed — a rational state policy could justify a deviation from the present interpretation of the one-man, one-vote doctrine. In so doing, the *Scrimminger* Court felt it essential to disregard our own constitutional mandate for placing Senate districts within whole counties. Then the *Mahan* decision became the law and in response Chief Justice Weintraub rejuvenated a form of the county concept and called it the "county line" idea in *Davenport I, supra.* More properly, the viability of the "county line" concept returned on its own volition once the one-man, one-vote concept was clarified by *Mahan, supra.* Our Court not only realized, as did Justice Rehnquist in *Mahan,* that the community of interest of a county is a rational state policy which can support a greater mathematical

deviation, but also that partisan political districting is an acceptable political expression insofar as districting is essentially a political process. Both the *Gaffney* Court and the *Davenport I Court* recognized the distinction between partisan political districting and gerrymandering of bizarrely shaped districts. Both Courts seemed to agree that the former was unavoidable and the latter unacceptable. Mr. Justice White in *Gaffney* paid judicial recognition to this principle and added, because of the political and legislative process inherent in redistricting, the federal courts should refrain from excessive interference. Chief Justice Weintraub, alluding to the unacceptability of "crazy-quilt" patterns without a rational basis, realized that the opposite plan could have its own shortcomings also, and to this end he quoted *Gaffney* in *Davenport I, supra* at 445 of 63 *N. J.*:

> * * * And what is to happen to the master's plan if a resourceful mind hits upon a plan better than the master's by a fraction of a percentage point? Involvements like this must end at some point, but that point constantly recedes if those who litigate need only produce a plan that is marginally "better" when measured against a rigid and unyielding population equality standard. (412 U. S. at 750, 93 S. Ct. at 2330, 37 *L. Ed.* 2d at 310–311).

What is of overriding importance is that *Scrimminger* was pre-*Mahan* and *Davenport I* post-*Mahan*. Both cases must be read in that light. The United States Constitutional standard has eased and now permits a 16.4% deviation from mathematical equality if a rational state policy is effectuated. While this in itself does not compel the Court to accept a greater deviation, *Mahan* has alleviated the intransigence of the one-man, one-vote standard so as to allow the pertinent portions of our State Constitution more leeway which, in turn, obliges this Court to abide by some sort of county concept.

As a direct consequence of the foregoing, there emerge two constitutional mandates, the first being the "county line" concept and the second, the requirement of compactness. This conclusion inevitably follows from our long State history

of abiding by county lines for Senatorial redistricting purposes and also from our time-honored constitutional interpretative tradition of not restrictively reading constitutional provisions but by viewing them broadly and as a whole. I, therefore, respectfully adopt the position that compactness is not only a criterion followed in forming Assembly districts, but is also applicable by implication to ¶¶ 1 and 2 when read in conjunction with ¶ 3 of Art. IV, § 2 of the New Jersey Constitution. However, the role which compactness will play in redistricting the Senate and what its precise meaning is, remains an open question. The Appellate Division in *Davenport v. Apportionment Comm.*, 124 *N. J. Super.* 30, 43 (1973), said that:

Although the impact of the compactness directive cannot be precisely stated, we believe that the word itself can be given meaningful content. *Webster's Third New International Dictionary* (1966) defines "compact" as "marked by concentration in a limited area." Technically, we interpret the requirement of compactness to mean that between two districts of equal area the one with the smaller perimeter is the more compact. A somewhat similar idea was projected by counsel for the Apportionment Commission at the oral argument — that the objective of compactness could be determined by drawing a circle around each of the proposed districts. Those districts which occupy relatively greater areas within the circle could be said to be more compact. See *People v. Swift*, 270 *Ill.* 532, 110 *N. E.* 904, 905 (Sup. Ct. 1915).

This Court in *Scrimminger v. Sherwin, supra,* 60 *N. J.* at 498, stated that:

* * * The requirement for contiguity will obtain. So also will the requirement for compactness, which may serve to justify a deviation or to curb the quest for partisan gain, although, as we have noted before, compactness may be of limited utility in the light of the odd configurations of our State and its municipalities. (*Jackman,* 49 *N. J.* at 419).

Even though "compactness may be of limited utility" in redistricting plans, this dissent believes that the criterion must still be required and cannot be ignored. My colleagues and the Commission again fail to heed a constitutional man-

date, *i. e.,* compactness. The majority is apparently ready to support a redistricting plan which includes "shoe lace," "bowling alley," "horseshoe" and "crazy quilt" configurations. In all good conscience, I cannot sacrifice everything to the demagoguery of statistical niceties, as the United States Supreme Court could not in *Mahan* and *Gaffney*. Disregarding the difficulties attending the meaning of compactness, although the Appellate Division's explanation is as good as any, a trier of fact, after having examined all the evidence, should have a sense of feeling whether an individual plan should be revised or received as is. These determinations should be made on a case-by-case basis and accepted or rejected on their own merits or deficiencies.

This dissent forthrightly maintains that the Commission has infringed upon two positive constitutional mandates. The constitutional duty of this Court is far from being synonymous with political expediency. Granted, the legislators would have an easier time if the boundaries of their districts were not in a constant state of flux, yet if the Constitution requires alteration, as it presently does, so be it.

My brothers believe that a mere equal nose count can best represent and serve the public. This may have been the law two years ago, but recent United States Supreme Court developments are contrary. It is the contention of this dissent that the Apportionment Commission is obligated to conform to as many county lines as practical and not haphazardly create districts as they presently have, involving excessive county fragmentation. I still recognize, however, that the overriding federal rule is one-man, one-vote, but abiding by as many county lines as practical will not substantially emasculate this doctrine. There will inevitably be some county fragmentation among the 40 Senate districts, but merely because some county fragmentation is an unavoidable consequence does not mean that the entire concept of the county unit as a recognized and viable political subdivision must be discarded.

The "county line" concept can be directly traced back to and is supported by *Reynolds v. Sims, supra,* and its progeny, particularly *Mahan v. Howell, supra,* and *Gaffney v. Cummings, supra.* The value of a county, not only politically, but practically as well, has finally been given the recognition it deserves. This is precisely why Mr. Justice Rehnquist in *Mahan* permitted a deviation of 16.4% ; why Chief Justice Weintraub appreciated the value of the county concept in *Jackman v. Bodine,* 43 *N. J.* 453, 462–463 (1964) ; and why this Court withdrew in *Davenport I, supra,* what had been said in regard to the county concept in *Scrimminger, supra.*

An additional ingredient, which must be blended with the above when reapportioning, is compactness. Compactness is not a political concept, but a constitutional tool to better facilitate and guarantee that a community of interest is represented properly. Although it may not be a strong and dominant factor due to uncertainty over its meaning, it is nonetheless a positive consideration. If, for instance, a proposed plan does not unduly fragment county lines, it may still be nullified if districts within a county are outrageously designed.

By reason of the foregoing, a different balance or synthesis must presently be struck. By implementing the "county line" concept, where as many county lines as practical are utilized in creating voting districts, this State can reap the advantages of both the one-man, one-vote doctrine and the "county line" concept while substantially eliminating many evils of both. These are the two essential elements that should be recognized.[2]

---

[2]In an objective and mathematical demonstration supporting this dissent's conclusions, the following is set forth for evaluation:

(a) This indicates the number of different districts partially or wholely contained within single counties in contrast to the ideal number of districts each county should contain.

After 12 appearances before this Court concerning reapportionment, I believe we have the right to insist that, substantially, no districts should be designed in bizarre shapes and tortured configurations resulting in a horrendous hodgepodge. The time for putting out little political fires by constant reshaping of the districts has long passed.

This Court has been advised that computer services are available. All criteria — the primary goal of equal population, as well as contiguity, compactness and minimal transgression of county lines — can be translated into practical

| County | No. of districts contained within a single county. (the numbers designate the respective districts). | The ideal no. of districts each county should contain |
|---|---|---|
| 1. Atlantic | #2 = 1 district | .977 |
| 2. Bergen | #36, 37, 38, 39, 40 = 5 districts | 5.01 |
| 3. Burlington | #2, 4, 6, 7, 8, 9 = 6 districts | 1.803 |
| 4. Camden | #4, 5, 6 = 3 districts | 2.546 |
| 5. Cape May | #1 = 1 district | .332 |
| 6. Cumberland | #1 = 1 district | .677 |
| 7. Essex | #25, 26, 27, 28, 29, 30 = 6 districts | 5.190 |
| 8. Gloucester | #3, 4 = 2 districts | .964 |
| 9. Hudson | #30, 31, 32, 33 = 4 districts | 3.40 |
| 10. Hunterdon | #14, 16 = 2 districts | .389 |
| 11. Mercer | #8, 13, 14 = 3 districts | 1.696 |
| 12. Middlesex | #12, 14, 17, 18, 19, 21 = 6 districts | 3.258 |
| 13. Monmouth | #8, 9, 10, 11, 12 = 5 districts | 2.563 |
| 14. Morris | #14, 16, 22, 23, 24, 25 = 6 districts | 2.140 |
| 15. Ocean | #2, 8, 9, 10 = 4 districts | 1.163 |
| 16. Passaic | #15, 24, 25, 34, 35 = 5 districts | 2.571 |
| 17. Salem | #3 = 1 district | .337 |
| 18. Somerset | #16, 17 = 2 districts | 1.107 |
| 19. Sussex | #15 = 1 district | .433 |
| 20. Union | #20, 21, 22, 24 = 4 districts | 3.031 |
| 21. Warren | #15 = 1 district | .412 |

It can readily be seen that in numerous instances, the actual total number of districts for various counties exceeds the ideal, indicating that many more county lines have been fragmented than are really necessary.

Special note should be taken of the following districts which contain multi-counties, again resulting in excessive county line fragmentation.

instructions for computer analysis. See *O'Rourke, Reapportionment: Law, Politics, Computers* (1972).

I would, therefore, request that the Apportionment Commission draw up a number of alternative plans indicating how many districts can be placed within and along county lines and at what deviations, utilizing all of the aforementioned criteria. The subject matter should be returned to the Apportionment Commission for the preparation of other plans and a statement from said Commission which plan or plans it would recommend for adoption.

*For affirmance*—Chief Justice HUGHES and Justices JACOBS, HALL, MOUNTAIN, SULLIVAN and CLIFFORD—6.

*For reversal*—Justice PASHMAN—1.

| District number | Counties or parts thereof which each district contains |
|---|---|
| 4 | Camden, Gloucester, Burlington |
| 8 | Burlington, Ocean, Monmouth, Mercer |
| 9 | Ocean, Burlington, Monmouth |
| 14 | Mercer, Hunterdon, Morris, Middlesex |
| 16 | Somerset, Hunterdon, Morris |
| 17 | Middlesex, Somerset |
| 24 | Morris, Union, Passaic |
| 25 | Essex, Morris, Passaic |

(b) As this dissent has maintained, the following districts have clearly violated our Constitution's mandate for compactness.

Horseshoe districts:
 32 and 33 in Hudson County
 12 in Monmouth and Middlesex Counties
 20 in Union County

Shoelace and horsehoe districts:
 28 in Essex County
 22 in Union and Morris Counties

Shoelace district:
 36 in Bergen County

Hourglass district:
 18 in Middlesex County

In addition, most of the multi-county districts previously mentioned have also violated compactness.