GROVER C. RICHMAN, Jr., ATTORNEY-GENERAL OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. CHESTER K. LIGHAM, DEFENDANT-APPELLANT.

Argued May 7, 1956—Decided June 13, 1956.

*Mr. Benjamin C. Van Tine* argued the cause for the appellant.

*Mr. Harold Kolovsky,* Assistant Attorney-General, argued the cause for the respondent (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney).

*Mr. Walter H. Jones* argued the cause *amicus curiae* for the Senate and General Assembly of the State of New Jersey.

The opinion of the court was delivered by

JACOBS, J. The State Rent Control Act of 1953 was approved by the Governor on July 7, 1953 and was to terminate on December 31, 1954. See *L.* 1953, *c.* 216; *N. J. S.* 2*A* :42–14. It created the State Rent Control Office within the Department of Conservation and Economic Development and provided that it shall be headed by a Director appointed by the Governor with the advice and consent of the Senate. The Director's term was fixed in section 2 to commence on appointment and confirmation and to expire on July 1, 1955.

The defendant Chester K. Ligham was duly appointed as Director and entered upon his duties on or about December 21, 1953. Thereafter the statute was amended by *L.* 1954, *c.* 260 which was approved by the Governor on December 22, 1954. The amendatory enactment provided that the act shall terminate at midnight June 30, 1956 except as otherwise provided in section 2; section 2 was amended to set forth that the Director's term shall expire on December 31, 1956 and that the purpose of the additional period of six months was to enable the Director to wind up the administration of State Rent Control.

After the passage of *L.* 1954, *c.* 260 the defendant asserted that he was entitled to continue as Director until his term of office expired on December 31, 1956. The Attorney-General embraced a contrary view and filed a complaint in the Law Division seeking judgment (a) adjudging that the Director's term expired on July 1, 1955, and (b) ousting the defendant from the office of Director which he claimed to occupy. After answer was filed the Attorney-General moved for judgment on the pleadings (*R. R.* 4:12–3), and after full argument the motion was granted by the late Judge Smalley. A formal judgment granting the relief sought by the Attorney-General was entered by Judge Ewart on January 27, 1956 and on the same day the defendant filed his notice of appeal to the Appellate Division. In view of the important constitutional questions presented we certified the appeal on our own motion and have had the benefit of able briefs and argument by counsel for the parties and the Senate and General Assembly.

█ The Attorney-General's contention is that if *L.* 1954, *c.* 260 contemplated extending the Director's term to December 31, 1956, it constituted an appointment of an executive or administrative officer by the Legislature in violation of *Article* IV, *Section* V, *paragraph* 5 of the *Constitution of* 1947. The contention in opposition is that while *L.* 1954, *c.* 260, did contemplate extending the Director's term to December 31, 1956, such extension did not violate *Article* IV, *Section* V, *paragraph* 5 when properly construed in the

light of the entire Constitution and particularly *Article* V, *Section* I, *paragraph* 12; *Article* V, *Section* IV, *paragraph* 1, and *Article* IV, *Section* VII, *paragraph* 9. The parties place reliance on the general principles of constitutional construction which were recently restated in *Behnke v. New Jersey Highway Authority*, 13 *N. J.* 14, 24 (1953). See also *Fischer v. Twp. of Bedminster*, 5 *N. J.* 534 (1950); *John S. Westervelt's Sons v. Regency, Inc.*, 3 *N. J.* 472 (1950); *State v. Murzda*, 116 *N. J. L.* 219 (*E. & A.* 1936). In the *Behnke* case, Justice Heher rightly noted that in interpreting our State Constitution the thing to be sought "is the intent of the people in imposing the particular restraint" and that the document must be considered as a whole to ascertain its true meaning; and he quoted approvingly from the concurring opinion in *Downes v. Bidwell*, 182 *U. S.* 244, 312, 21 *S. Ct.* 770, 796, 45 *L. Ed.* 1088, 1116 (1901), where Justice White pointed out that "the true rule of construction is not to consider one provision of the Constitution alone, but to contemplate all, and therefore to limit one conceded attribute by those qualifications which naturally result from the other powers granted by that instrument, so that the whole may be interpreted by the spirit which vivifies, and not by the letter which killeth."

"Upon this point a page of history is worth a volume of logic." Holmes, J. in *New York Trust Co. v. Eisner*, 256 *U. S.* 345, 349, 41 *S. Ct.* 506, 507, 65 *L. Ed.* 963, 983 (1921).

The changes wrought in our new Constitution, including those which relate to the appointing power, were the results of persistent efforts and the extensive teachings of history. In Colonial New Jersey the royal Governor appointed most officers and dominated the Legislature which consisted of the Governor, an appointed Council and an elected Assembly. The people generally distrusted the Governor and their struggle for rights was conducted mainly through the Assembly. When in 1776 they overthrew Great Britain's authority and hastily adopted their first constitution they paid but little heed to the doctrine of separation of powers and placed their

trust mainly in their elected legislative representatives who in turn designated the Governor. The power to appoint public officers was vested in the representatives rather than in the Governor who was the supreme executive in name only. See *Griffith, Eumenes—Errors and Omissions of the Constitution of New Jersey* 130 (1799). When the Federal Constitution was later adopted it wisely paid much more attention to the doctrine of separation of powers and expressly provided for the important presidential power of appointment as an executive function. See *Springer v. Government of Philippine Islands,* 277 *U. S.* 189, 48 *S. Ct.* 480, 72 *L. Ed.* 845 (1928); *Myers v. United States,* 272 *U. S.* 52, 47 *S. Ct.* 21, 71 *L. Ed.* 160 (1926). *Cf. Note, "Power of Appointment to Public Office Under the Federal Constitution,"* 42 *Harv. L. Rev.* 426 (1928); *Corwin, The President—Office and Powers* (*3d ed.* 1948), 83.

Between 1776 and New Jersey's Constitutional Convention of 1844, appointments were made by the legislative branch and were accompanied by many abuses; one of the most extended debates during the 1844 Convention dealt rather heatedly with the matter. See *Proceedings, New Jersey Const. Conv.* 1844, *p.* 348 *et seq.* Mr. Field, a former Attorney-General and legislator, favored giving to the Governor the appointing power which he described as "the *great* Executive power" (*cf. Padover, Complete Jefferson* 289 (1945)), and he detailed many of the adverse public incidents and effects of legislative appointments. *Id.,* at 357. See *Bebout, The Making of the New Jersey Constitution lvi* (1945). On the other hand, Dr. Ewing, a former member of the Legislature, favored legislative appointments as being closer to the people. Ultimately the matter was compromised and the Constitution distributed the appointing power; the Legislature was authorized to appoint certain designated officers in "joint meeting"; the Governor was authorized to appoint other designated officers, generally with the advice and consent of the Senate; and *Article* VII, *Section* II, *paragraph* 8 provided that "All other officers, whose appointments are not otherwise provided for by law, shall be

nominated by the governor and appointed by him with the advice and consent of the senate." Under this clause the Legislature continued to create new offices and designate their incumbents; in *Ross v. Board of Chosen Freeholders of Essex,* 69 *N. J. L.* 291 (*E. & A.* 1903), the court of last resort sustained such legislative appointments as against the contention that they violated the Governor's inherent executive power. Courts throughout the country had sharply divided on the. issue, but their determinations rested generally on local constitutional provisions which had no counterparts in New Jersey's Constitution. See *Mechem, "The Power to Appoint to Office: Its Location and Limits,"* 1 *Mich. L. Rev.* 531 (1903); *Dawley, "The Governors' Constitutional Powers of Appointment and Removal,"* 22 *Minn. L. Rev.* 451 (1938). *Cf. Tilton, "The Appointive Power— Tenure, Removal and Confirmation of Officers,"* 2 *Record of Proceedings, Const. Conv.* 1947, *p.* 1383 *et seq.* (1951). See also *Tucker v. State,* 218 *Ind.* 614, 35 *N. E. 2d* 270 (1941). In his summary of the cases (made shortly after the turn of the century) Professor Mechem, *supra,* expressed the view that although the power of appointment "as a matter of public policy ought not to be regarded as a legislative function" it was not, under most of the decisions, "exclusively or necessarily an executive function."

In the *Ross* case, *supra,* Justice Dixon, in sustaining legislation which empowered Supreme Court justices to appoint park commissioners, pointed out that although under the English system the king might be said to be the depositary of the appointing power, under our system no single branch of government could be deemed the king's successor in this regard; and he suggested that an examination of our constitutional and legislative history would readily dissipate the notion that the appointing power was the peculiar property of any of the three departments of government. He referred specifically to *Article* VII, *Section* II, *paragraph* 8 as "unmistakable recognition of the authority of the law-making department to provide for the appointment of all officers whose appointment is not definitely regulated by the

Constitution itself"; and although he was not dealing with the right of the Legislature to make an appointment itself, as distinguished from its designation of a proper appointing authority, the tenor of his opinion sufficiently evidenced his view that neither approach was in violation of the Constitution. See *Driscoll v. Sakin,* 121 *N. J. L.* 225 (*Sup. Ct.* 1938), affirmed 122 *N. J. L.* 414 (*E. & A.* 1939); *State v. Biehl,* 135 *N. J. L.* 268 (*Sup. Ct.* 1947). In any event, the widespread legislative practice, which was to continue until the 1947 Constitution, was to determine unrestrictedly who shall appoint officers to newly created offices; on many occasions the Legislature itself acted as the appointing authority, sometimes by designating the appointee in the enactment and sometimes by designating him at joint session pursuant to law. Among well known instances were the creation of the Department of Motor Vehicles by *L.* 1926, *c.* 147 (*R. S.* 39:2–2), which provided that the first commissioner shall be William L. Dill and that later commissioners shall be elected by joint session of the Legislature; the creation of the Department of Alcoholic Beverage Control by *L.* 1933, *c.* 436 (*R. S.* 33:1–3), which provided that the first commissioner shall be D. Frederick Burnett and that later commissioners shall be elected by joint session; and the establishment of the Milk Control Board by *L.* 1941, *c.* 274 (*R. S.* 4:12A–2) which named Mary Prall Logue, J. M. Nevius and John C. Borden as its members and provided that their successors shall be appointed by the Senate and General Assembly in joint meeting. Each of these enactments was passed by the Legislature over the Governor's veto; and in his discussion of the veto of *L.* 1933, *c.* 436 Governor Moore (in his annual message dated January 9, 1934) noted distressingly that "the legislature has assumed the administrative function of appointment of the Beverage Commissioner."

The great weaknesses in the 1844 Constitution became apparent early after its adoption and in 1873 Governor Parker recommended its revision through a constitutional convention. See *Erdman, The New Jersey Constitution—A Barrier to*

*Governmental Efficiency and Economy* (1934). A commission was appointed which made recommendations culminating in the constitutional amendments of 1875; they dealt *inter alia* with restrictions against the passage of special laws and did not bear significantly on the power of appointment; similarly the constitutional amendments of 1897, 1927 and 1939 had no pertinent relation to the appointment of public officers. Later Governors, including notably Wilson, Edge, Edison and Driscoll, continued the efforts for constitutional revision and pointed to the urgent need of strengthening the executive and restricting the legislative power of appointment. In 1941 the Commission on Revision of the New Jersey Constitution, headed by Robert C. Hendrickson, was duly appointed and it submitted a comprehensive report during the following year. It recommended the overhauling of the judicial branch, a strengthening of the executive branch, and changes in the legislative branch designed to increase its effectiveness as the State's law-making body. In summarizing its proposed changes it pointed out that "The legislature cannot appoint or elect any executive, administrative or judicial officer except the State Treasurer and State Comptroller"; and in explaining the purposes underlying this provision it expressed the belief that "Legislative exercise of the power of appointment to public office—an essentially executive power—has also contributed to reduce the effectiveness of the Legislature as a law-making body." Thereafter, the Legislature approved a new constitution for submission to the people at the November 1944 general election and in a series of public addresses supporting its adoption Governor Edison discussed its changes. In his March 23, 1944 address at Montclair he referred specifically to legislative appointments, which he illustrated by the Milk Control Board and the Commissioner of Alcoholic Beverage Control, and he suggested that the attendant evils would be eliminated by the direction that "Neither the Legislature nor either House thereof shall elect or appoint any executive, administrative or judicial officer, except as expressly provided in this Constitution." At the November 1944 general

election the people rejected the proposed constitution; however, the defeat was short-lived and in 1947, following Governor Driscoll's inaugural address and the adoption of enabling legislation, a convention was held to deal anew with the drafting of a constitution.

At the 1947 Convention the needs for strengthening the Executive and increasing the efficiency of the Legislature as a law-making body by curbing its appointments were among the most important fields of discussion. In due course, the Committee on the Legislature recommended and the Convention adopted an express provision that "Neither the Legislature nor either house thereof shall elect or appoint any executive, administrative or judicial officer except the State Auditor." *Const.* 1947, *Art.* IV, *Sec.* V, *par.* 5. The committee also recommended and the Convention adopted a separate provision that "The Legislature may appoint any commission, committee or other body whose main purpose is to aid or assist it in performing its functions" and that "Members of the Legislature may be appointed to serve on any such body." *Const.* 1947, *Art.* IV, *Sec.* V, *par.* 2. The Committee on the Executive recommended and the Convention adopted provisions which directed that all executive and administrative offices be allocated within not more than 20 principal departments and that "Temporary commissions for special purposes may, however, be established by law and such commissions need not be allocated within a principal department" (*Const.* 1947, *Art.* V, *Sec.* IV, *par.* 1); that the heads of principal departments shall be single executives unless otherwise provided by law, and that such single executives shall be nominated and appointed by the Governor, with the advice and consent of the Senate, to serve at the pleasure of the Governor, except as otherwise provided with respect to the Secretary of State and the Attorney-General (*Const.* 1947, *Art.* V, *Sec.* IV, *par.* 2); that whenever a board or commission is head of a principal department it shall be nominated and appointed by the Governor with the advice and consent of the Senate, and that the principal executive officer appointed by such board or commission shall

be subject to the approval of the Governor (*Const.* 1947, *Art.* V, *Sec.* IV, *par.* 4); and that the Governor "shall nominate and appoint, with the advice and consent of the Senate, all officers for whose election or appointment provision is not otherwise made by this Constitution or by law." *Const.* 1947, *Art.* V, *Sec.* I, *par.* 12. See *Baisden, Charter For New Jersey* 23 (1952).

There seems to be no dispute that the office of Director of State Rent Control Office is executive or administrative rather than legislative in nature. In his brief, counsel for the appellant asserts that "the defendant has never claimed that the Director is not an executive or administrative officer"; and at oral argument both he and counsel for the Senate and General Assembly disavowed any contrary approach. In any event, the Legislature placed the office within one of the principal executive departments and prescribed rule-making and other administrative powers and duties which are clearly comparable to those exercised by acknowledged state administrative agencies. See *Jamouneau v. Harner,* 16 *N. J.* 500 (1954), *certiorari* denied 349 *U. S.* 904, 75 *S. Ct.* 580, 99 *L. Ed.* 1241 (1955). *Cf. Abbotts Dairies, Inc. v. Armstrong,* 14 *N. J.* 319 (1954); *Gaine v. Burnett,* 122 *N. J. L.* 39 (*Sup. Ct.* 1939), affirmed 123 *N. J. L.* 317 (*E. & A.* 1939). See also *Bowles v. Willingham,* 321 *U. S.* 503, 64 *S. Ct.* 641, 88 *L. Ed.* 892 (1944); *Como Farms, Inc. v. Foran,* 6 *N. J. Super.* 306 (*App. Div.* 1950); *Wilentz ex rel. Golat v. Stanger,* 129 *N. J. L.* 606 (*E. & A.* 1943); and *Davis, Administrative Law* 1 (1951), where the author defined administrative agencies as organs of government (other than courts and legislatures) which affect the rights of private parties through adjudication or rule-making. We have little doubt that if the Legislature had itself sought to appoint the first Director of the Office of Rent Control (either in the statute itself or at joint session) it would have violated *Article* IV, *Section* V, *paragraph* 5 which prohibits the Legislature and either house thereof from electing or appointing any "executive, administrative or judicial officer" except the State Auditor. At

oral argument counsel for the Senate and General Assembly expressly conceded that a legislative appointment which would be invalid if made in joint session would be equally invalid if embodied in a statute, but counsel for the appellant took the much narrower position that the legislative appointment would be improper only if made in joint session. Acceptance of the interpretation advanced by the appellant's counsel might quickly and unhappily revive the former practice evidenced by the direct statutory appointments of the Director of Motor Vehicles in 1926, the Commissioner of Alcoholic Beverage Control in 1933, and the members of the Milk Control Board in 1941; the constitutional delegates and the people of the State clearly intended to outlaw such appointments which they considered to be grossly inimical to good government, and we would be remiss in our duty if we did not sympathetically seek to effectuate their intent as appropriately expressed in the broad language of the Constitution. It is to be noted that although the 1844 Constitution did mention appointments "by the senate and general assembly in joint meeting" (see *e. g.*, *Article* VII, *Section* II, *paragraph* 2), the 1947 constitutional restriction on legislative appointments contains no reference to appointments "in joint meeting"; it is not so confined, and we are satisfied that its designed effect is to prohibit all executive and administrative appointments by the Legislature whether in joint meeting or otherwise. In view of the enlightening constitutional history and the unrestricted constitutional terminology, we find no merit in the appellant's contention that the reference in *Article* IV, *Section* V, *paragraph* 5 to "either house" of the Legislature and the omission of any express restriction against appointments "by law" furnish significant indications of an intent by the delegates and the people to sanction direct legislative appointments of executive and administrative officers, as theretofore, in statutes approved by the Governor or passed by the Legislature above his veto. Nor do we find any merit in the suggestion that the Governor's actual approval of a statute embodying such a legislative appointment may serve

to validate it; neither the Governor nor the court is in any position to sanction an appointment made in a manner prohibited by the Constitution.

The next question requiring our attention is whether a statutory extension of an incumbent executive or administrative officer's term constitutes an appointment by the Legislature within the contemplation of *Article IV, Section V, paragraph 5*. If such extension is construed as not amounting to an appointment then there would appear to be nothing in the Constitution to prohibit the Legislature from continuing all executive and administrative officers (except those few expressly provided for in the Constitution) for a period beyond the term of a newly elected Governor; a result so patently undesirable and enervating to democratic government was never envisioned and nothing in the language of the Constitution compels us to reach it. Indeed, most of the decisions elsewhere in the country support the commonsensible view that the extension of the term of an incumbent is equivalent to a new appointment which may be made only by a proper appointing authority. See *People ex rel. Fowler v. Bull*, 46 *N. Y.* 57 (1871); *People ex rel. Le Roy v. Foley*, 148 *N. Y.* 677, 43 *N. E.* 171 (1896); *State ex rel. Hamilton v. Krez*, 88 *Wis.* 135, 59 *N. W.* 593 (1894); *People ex rel. Lovett v. Randall*, 151 *N. Y.* 497, 45 *N. E.* 841 (1897); *O'Connor v. City of Fond Du Lac*, 109 *Wis.* 253, 85 *N. W.* 327, 53 *L. R. A.* 831 (1901); *State ex rel. Dithmar v. Bunnell*, 131 *Wis.* 198, 110 *N. W.* 177 (1907); *Board of Elections v. State ex rel. Schneider*, 128 *Ohio St.* 273, 191 *N. E.* 115, 97 *A. L. R.* 1417 (1934); *State ex rel. Taylor v. Mount*, 151 *Ind.* 679, 51 *N. E.* 417, 52 *N. E.* 407 (1898). *Cf. Note, "Power of legislature to extend term of public office,"* 97 *A. L. R.* 1428 (1935).

In the *Fowler* case the New York Legislature sought to extend the term of a judge who had been elected for six years; in striking down this action the court expressed the view that if the legislature could extend the term for a year it could do so for any number of years, "and thus the duration of the term thereof may be perpetuated by legislative

power." In the *Randall* case [151 *N. Y.* 497, 45 *N. E.* 843], the court stated that "an act of the legislature extending the term of a town officer then in office is virtually an appointment to the office for the extended time." In the *O'Connor* case [109 *Wis.* 253, 85 *N. W.* 332], the court approved an earlier holding that the legislative extension of an incumbent's term is "equivalent to a new appointment to the office and void if the office be one that the legislature cannot fill by direct appointment or election." And in the *Mount* case [151 *Ind.* 679, 51 *N. E.* 419], the court pointed out that legislation lengthening the terms of incumbent office holders "would be the equivalent of appointing them for such extended term." It is true, as the appellant suggests, that the foregoing decisions may be distinguished in the light of their facts and the particular constitutional provisions which governed them; but the general principle which they approve—namely, that a legislative extension of an incumbent's term is equivalent to a new appointment which may be made only by a proper appointing authority—seems to be entirely well-grounded and has our full support.

█ The appellant places some reliance on the concluding sentence in *Article* V, *Section* I, *paragraph* 12, which sets forth that the Governor "shall nominate and appoint, with the advice and consent of the Senate, all officers for whose election or appointment provision is not otherwise made by this Constitution or by law." The 1844 Constitution had comparable language without, however, embodying any pertinent restriction against legislative appointments. The new provision in *Article* IV, *Section* V, *paragraph* 5 of the 1947 *Constitution,* prohibiting appointments by the Legislature of executive and administrative officers, must necessarily be read in conjunction with *Article* V, *Section* I, *paragraph* 12. Thus read they mean, as the Attorney-General now contends, that although the Legislature may by law designate proper appointing authorities for newly created offices it may not itself appoint any executive, administrative or judicial officer except the State Auditor. In *State ex rel. Jameson v. Denny,* 118 *Ind.* 382, 21 *N. E.* 252, 258, 261, 4 *L. R. A.* 79 (1889)

(concurring opinion), Chief Justice Elliott noted that it was "one thing to make a place for a man by enacting a law, and another thing to put him in that place"; in *State ex rel. Worrel v. Peelle,* 121 *Ind.* 495, 22 *N. E.* 654, 658 (1889), the court remarked that there was "a manifest distinction between providing the mode of doing a thing and doing the thing itself"; and in *State ex rel. Dithmar v. Bunnell, supra* [131 *Wis.* 198, 110 *N. W.* 184], the court advanced the further suggestion that the power to make a law for the appointment of an officer did not generally "include the power of making the appointment itself." But *cf. Ross v. Board of Chosen Freeholders of Essex, supra.* In any event, we find nothing in *Article V, Section I, paragraph* 12 which casts any doubt on the sweep of the explicit constitutional prohibition in *Article IV, Section V, paragraph* 5 against legislative appointments of executive and administrative officers.

■ The appellant urges that *Article IV, Section V, paragraph* 5 should be construed as inapplicable where the legislative appointment is "to a temporary office created under the police power to meet a public emergency." The constitutional provision contains no such limitation—in terms it clearly applies to all executive, administrative and judicial officers. *Article V, Section IV, paragraph* 1 does state (after setting forth that the executive and administrative offices of the State Government shall be allocated within not more than 20 principal departments) that temporary commissions for special purposes may be established by law and that "such commissions need not be allocated within a principal department." The Legislature has the undoubted right to create temporary commissions (see *Hourigan v. North Bergen Township,* 113 *N. J. L.* 143 (*E. & A.* 1934); *cf. Giannone v. Carlin,* 20 *N. J.* 511 (1956)), and the quoted language eliminates the need for allocating them within the principal departments; however, *Article V, Section IV, paragraph* 1 clearly has no bearing on the unqualified restriction against legislative appointments of executive and administrative officers. Indeed, if the appellant's contrary view were accepted the constitutional .prohibition could

readily be defeated by renewals of temporary emergency legislation, as illustrated by the history of milk regulation in our State. See *Abbotts Dairies, Inc. v. Armstrong,* 14 *N. J.* 319 (1954). The first Milk Control Act (*L.* 1933, *c.* 169) was to expire on July 1, 1935; the second Milk Control Act took effect on June 1, 1935 (*L.* 1935, *c.* 175) and was to expire on June 30, 1937; *chapter* 56 of the *Laws of* 1937 continued the 1935 Act until 1939 and *chapter* 82 of the *Laws* of 1939 enacted a third Milk Control Act to remain in effect until 1941. In *chapter* 274 of the *Laws* of 1941 a fourth Milk Control Act was enacted to remain in effect until the Legislature terminated its operation; and although in 1948 the Legislature transferred milk control functions to the Office of Milk Industry within the Department of Agriculture (*L.* 1948, *c.* 447), the statute still provides that it shall remain effective "until such date as the Legislature shall determine an emergency no longer exists." *R. S.* 4:12A–52. It is particularly worthy of note that when legislative appointments and their accompanying evils were being decried by Governor Edison and others, the illustrative references included the so-called emergency legislation creating the Milk Control Board of 1941 and designating its members.

In *Jamouneau v. Harner, supra,* 16 *N. J.,* at *page* 514, Justice Heher aptly noted that emergencies do not create constitutional powers though they may furnish the occasion for their exercise. The appellant's brief expressly disavows any claim "that the emergency has enlarged the power of the legislature" (*cf. Home Building & Loan Association v. Blaisdell,* 290 *U. S.* 398, 54 *S. Ct.* 231, 78 *L. Ed.* 413 (1934)), but relies on the "retained power" to create temporary offices without allocation as recognized in *Article* V, *Section* IV, *paragraph* 1; we have hereinbefore sufficiently expressed our belief that the cited provision is inapplicable. Furthermore, we suggest that the contention that an emergency actually existed requiring a legislative appointment is without basis. There presumably was an adequate public

emergency justifying the creation and continuance of the State Rent Control Office (*Jamouneau v. Harner, supra*) but that in nowise carried over to indicate the need for an appointment by the Legislature itself rather than by a proper appointing authority.

The final contention requiring discussion here bears on *Article* IV, *Section* VII, *paragraph* 9 of the *Constitution of* 1947; it provides that the Legislature shall not pass any private, special or local laws on certain subjects including (in *sub-paragraph* 5): "Creating, increasing or decreasing the emoluments, term or tenure rights of any public officers or employees." The appellant contends that the Constitution, in prohibiting special but permitting general laws increasing the terms of public officers, thereby authorized a legislative increase in the incumbent State Rent Control Director's term. It seems entirely clear that the Constitution permits such general laws only if they do not violate other express constitutional restrictions. Thus it is evident that the Legislature may not in any manner extend the term of an officer where it is fixed by the Constitution itself (see *e. g.*, the Secretary of State and the Attorney-General— *Article* V, *Section* IV, *paragraph* 3; *cf. Johnson v. State,* 59 *N. J. L.* 535 (*E. & A.* 1896); *Schalk v. Wrightson,* 58 *N. J. L.* 50 (*Sup. Ct.* 1895); *Imbrie v. Marsh,* 3 *N. J.* 578 (1950)); and it is equally evident that it may not extend the term of an incumbent officer where such extension is, in real effect, an appointment of an executive or administrative officer in violation of *Article* IV, *Section* V, *paragraph* 5. This conclusion is not only dictated by a proper reading of the whole Constitution (see *Behnke v. New Jersey Highway Authority, supra,* 13 *N. J.*, at *page* 28) but is also supported by the pertinent constitutional history.

The restriction against private, special and local laws became part of our organic law in 1875. Less than three years thereafter Chief Justice Beasley, in *State ex rel. Van Riper v. Parsons,* 40 *N. J. L.* 1 (*Sup. Ct.* 1878), had occasion to deal with it; he noted that its object was to exterminate, "root and branch, special and local legislation, and to sub-

stitute general law in the place of it, in every instance in which such substitution could be effected"; and he pointed out that it "relates to the methods and not to the substance of legislation" and that "its purpose was not to limit legislation, but to forbid only the doing, by special or local laws, those things that can be done by general laws." Decisions elsewhere dealing with comparable constitutional restrictions embody similar expressions. Thus in *Pennsylvania Co. for Insurances, etc. v. Scotl,* 329 *Pa.* 534, 198 *A.* 115, 117, (1938), the Supreme Court of Pennsylvania remarked that the restriction was only against local or special laws and that it relates "not to the substance, but to the method, of legislation." In several instances our courts sustained legislation increasing the terms of incumbent municipal officers upon findings that it was general in nature and therefore not violative of *Arlicle* IV, *Section* VII, *paragraph* 11 of the *Constitution* of 1844. See *McCarthy v. Roberson,* 123 *N. J. L.* 132 *(Sup. Ct.* 1939); *Stevenson v. Bridgelon,* 123 *N. J. L.* 219 *(E. & A.* 1939). When the Commission on Revision of the New Jersey Constitution submitted its report in 1942 it made what were described "as technical refinements of existing legislative limitations," and although it changed the language in *Article* IV, *Section* VII, *paragraph* 11, it gave no indication that there was any intent to alter, in any material respect, the state of the pre-existing law relating to local or special legislation affecting the terms of officers. Similarly, when the Committee on the Legislature of the 1947 Constitutional Convention dealt with the matter it indicated that it was recommending retention of the existing provision "without substantial change." See 2 *Record of Proceedings, Const. Conv.* 1947, *p.* 1076. Nowhere in the proceedings of the Convention is there to be found even the remotest suggestion that the altered language in *Article* IV, *Section* VII, *paragraph* 9 was intended to permit the Legislature to make appointments of executive and administrative officers, in disregard of *Article* IV, *Section* V, *paragraph* 5, through the device of general laws extending their terms.

██ When the constitutional delegates assembled during the summer of 1947 they were determined to create a living document embodying their high concepts of democratic government for themselves and oncoming generations. They wanted to provide for three truly strong though independent branches with adequate checks and balances. And they sought to avoid pitfalls which resulted from many of the minutely detailed provisions in the State's ancient Constitution by replacing them with general expressions of governmental principles which they believed to be well-grounded. One of these salutary principles is to be found in their prohibition of all appointments by the Legislature of executive, administrative and judicial officers; and if our courts are to keep faith with the delegates and the people of the State who overwhelmingly approved their efforts, they must be alert to this as well as the other constitutional interdictions and must be prepared to strike down subtle as well as patent departures. In the instant matter, we are satisfied that the Law Division properly found in favor of the plaintiff and that its judgment should in all respects be:

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, JACOBS and BRENNAN—6.

*For reversal*—None.