NORRIS, Circuit Judge, concurring in the judgment:
The 1984 Bankruptcy Act[1] increased the number of bankruptcy judgeships to 232. Congress filled these judgeships in two ways. The first — providing for the appointment of new judges by the Courts of Appeals — is unobjectionable. However, the second — extending the expiring terms of those bankruptcy judges serving on the date of enactment of the 1984 Act[2] — is, I conclude, unconstitutional under the Appointments Clause. U.S. Const, art. II, § 2, cl. 2. Because I disagree with the majority’s holding that congressional extensions are constitutional, I write separately. But because I conclude that Judge King was, as a holdover, statutorily authorized to exercise jurisdiction over the Bennys’ case, I concur in the judgment.
I
The majority reasons as follows: (1) the office of bankruptcy judge continued to exist between June 27, 1984, the ending date of the last Extension Act, and July 10, 1984, the starting date of the 1984 Bankruptcy Act; (2) because there was no “gap” in the underlying office, incumbent judges could remain sitting as holdovers until the 1984 Act came into effect; (3) because these judges were sitting as holdovers, section 106(a) of the 1984 Act did not appoint them to vacant offices but rather “merely” extended their terms for a period of two to four years; and (4) congressional extension of incumbent officeholders’ terms does not violate the Appointments Clause.
My principal disagreement with the majority’s position is that I believe the Appointments Clause precludes Congress from extending the terms of incumbent officeholders. I am simply unable to see *1143 any principled distinction between congressional extensions of the terms of incumbents and more traditional forms of congressional appointments.[3] Both implicate the identical constitutional evil-congressional selection of the individuals filling nonlegislative offices.[4]
The Appointments Clause mandates that public offices be “established by Law”— that is, by Act of Congress — while the officers are to be chosen either by the President with the advice and consent of the Senate or in the case of “inferior officers” by the President alone, the courts of law, or the heads of departments, as Congress may direct. The Clause, which precludes Congress from itself appointing individuals to serve in nonlegislative offices of the United States, is not a rule of “etiquette or protocol.” Buckley v. Valeo, 424 U.S. 1, 125, 96 S.Ct. 612, 685, 46 L.Ed.2d 659 (1976). Rather, it is one of the checks and balances reflecting the separation of powers principles that lie at the heart of our Constitution.
The reasons for prohibiting congressional appointments are well known. Our constitutional Framers perceived that “[t]he accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny. The Federalist No. 47, at 324 (J. Cooke ed. 1961) (Madison). More specifically, “the debates of the Constitutional Convention, and the Federalist Papers, are replete with expressions of fear that the Legislative Branch of the National Government will aggrandize itself at the expense of the other two branches.” Buckley, 424 U.S. at 129, 96 S.Ct. at 687. If Congress were free to appoint officials serving in the executive and judicial branches, then the exercise of executive and judicial powers by those officials would tend to reflect the political preferences of the majority party in Congress. The Framers rightly feared that the independence of the President’s authority to enforce the law, for example, would be undermined if she could act only through officials chosen by the legislature.
Congress can dictate with certainty who occupies an office by extending the terms of known incumbents as well as by appointing officers in the first instance. By extending the terms of known incumbents, Congress can guarantee that its choices will continue to serve for as long as Congress wishes, unless the officers can be removed.[5] Thus, congressional extension can effectively block the exercise of appointing power by the only officials consti *1144 tutionally authorized to exercise it — officials of the other branches of government. Selective exercise of this extension power could prove to be a potent political weapon. For example, if Congress wished to prevent the executive or judicial branch from filling an office about to become vacant with an appointee unfavorable to the prevailing congressional majority party, it could simply extend the incumbent’s term until a moré favorable group of officials took control of either the executive or judicial branch. Such a consolidation of power could prevent a minority party from ever replacing officials unless it gained a majority in Congress — gaining power in the executive and judicial branches would be of no avail. In effect, the majority party of the legislature could selectively retain officeholders sharing its values and views and permit replacement of the rest. This power contravenes the guiding principle of the Appointments Clause: although Congress may properly shift the appointment power from one official or one branch to another, may reserve for the Senate the power to block Presidential appointments,[6] and may even abolish the underlying office, under no circumstances may it give itself the sole authority to name the individual who will fill that office for a given term.
In effect, extension statutes allow Congress to arrogate to itself one of the powers of appointment — the power of reappointment. Indeed, it is hard to see any distinction between the congressional extension at issue here and a statute expressly authorizing congressional reappointment of incumbents. Would the majority reach the same constitutional result if Congress passed a statute providing that at the end of an incumbent’s term Congress could reappoint the incumbent, but that if it did not exercise its power of reappointment, the Court of Appeals for the D.C. Circuit could appoint someone to the office? One would hope not. Reappointment of an incumbent involves the same exercise of power as an initial appointment. In either instance, the appointing authority is called upon to exercise its judgment to determine the fitness of the individual to discharge the duties of the office. The majority, unfortunately, fails to explain how the congressional power to extend an incumbent’s term is any different from congressional reappointment, or, alternatively, how congressional reappointment could be constitutional.
Appellees bankruptcy trustee and the United States Senate argue that the legislative history surrounding Congress’ several attempts between 1978 and 1984 to extend the terms of bankruptcy judges reveals that Congress was not motivated by a desire to “trench on executive choice.” Appellees’ Brief at 43 & n. 34. I have no doubt that Congress’ motives were benign and public spirited. But I have difficulty accepting the notion that the constitutionality of congressional extensions should turn on whether Congress had its heart in the right place. And even if I accepted this notion, I could not join the majority’s apparent holding that all “short” congressional extensions are constitutional regardless of motive.
Moreover, a close examination of the legislative history cited by the Senate indicates that Congress decided to extend the terms of the bankruptcy judges for precisely the sort of reasons that were properly within the discretion of an independent appointing authority. Congress explicitly based its decision to grandfather the sitting bankruptcy judges through the transitional period on a determination that “new, inexperienced judges would be detrimental to the smooth transition” from the old to the new bankruptcy system and on its fear that “[political considerations, not considerations of merit, would enter into the appointments process of bankruptcy judges if the terms of the existing judges ex-pired____” H.R.Rep. No. 595, 95th Cong., 1st Sess. 289, reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6245.[7] These con *1145 siderations are certainly weighty and legitimate. However, the former is a congressional judgment. about the importance of experience that intrudes on the prerogative of an independent appointing authority to judge the qualifications of appointees for itself. The latter consideration, although couched in “apolitical” terms, involves a direct attempt to thwart the political will of the other branches, where the appointment power properly lies. It may well be that experience is a more important qualification than freshness of approach, and it may well be that considerations of “merit” should outweigh “political” considerations in choosing appointees, but these decisions ought to be made by constitutional appointing authorities, not by Congress. There was nothing to prevent the Courts of Appeals, vested with the appointment power under the 1984 Act, from reappointing the slate of incumbent judges. But the universe of individuals qualified to serve as bankruptcy judges was not limited to the June 27 incumbents, and the decision of Congress to exclude others was certainly a selection among potential officeholders. No doubt Congress acted on the basis of its judgment as to who would best serve as bankruptcy judges, and its choice seems eminently reasonable. But it was simply not a choice that Congress had the power to make.
The majority attempts to distinguish between a congressional appointment and a congressional extension of terms by drawing an analogy between an extension and an expansion of the duties of an incumbent officeholder. According to the majority, since Congress’ power to expand the duties of an existing office has long been recognized as permissible, see Shoemaker v. United States, 147 U.S. 282, 301, 13 S.Ct. 361, 37 L.Ed. 170 (1893), congressional extension power must likewise be constitutional. I cannot accept this proposition, as the two situations are qualitatively different.
The congressional power to expand the duties of an existing office is subject to a reasonable and relatively clear limitation: Congress may not devolve upon an officeholder responsibilities which are not germane to his existing duties. Shoemaker, 147 U.S. at 301, 13 S.Ct. at 361. When Congress merely adds duties to an office that are germane to the officeholder’s existing duties, Congress has simply expanded the power of an official in the field and for a period of time in which a valid appointing authority has already entrusted him to act. The interference with the appointing authority’s choice of personnel is marginal.
By contrast, it is apparent from reading the majority opinion that there is no principled or coherent limitation on the power to extend an incumbent’s term of office. The majority concedes that an extension for a “long time” would “logically” become similar to an appointment while maintaining that a “short extension” is constitutionally permissible. Majority Opinion at 1141. But the majority offers no explanation for why section 106(a)’s two- to four-year extension should be deemed “short” for constitutional purposes. Nor does it define precisely at what point between a “short” extension and a “long” extension Congress suddenly crosses the separation of powers line embodied in the Appointments Clause.
I fail to see how a line can be drawn "BSEween “short” and “long” extensions on any principled basis. The same constitutional evil the majority finds inherent in “long” extensions, that “[t]he persons authorized by the Constitution to appoint would be foreclosed from exercising that power, and the incumbent would remain in office unless he or she could somehow be removed,” Majority Opinion at 1141, is also present with short extensions. It is merely present for a shorter period of time. When discussing traditional modes of congressional appointment, the Supreme Court has implicitly rejected the notion that the Constitution proscribes appointments only if *1146 they are “long” rather than “short.” In Buckley the Court considered the constitutionality of legislative appointments for terms ranging from between six months to six years and, without making any distinction between “short” and “long” appointments, the Court declared unconstitutional all legislative appointments of officers of the United States. 424 U.S. at 126, 96 S.Ct. at 685. If, as I contend, extensions are merely one type of appointment, their length should likewise have no bearing on whether the Appointments Clause has been violated.
Because the majority’s short/long distinction is clearly unprincipled and unworkable as a guide for future judicial decision-making, I cannot sanction what the majority apparently feels is a “de minimis ” violation of the Appointments Clause. This approach to Appointments Clause analysis will inevitably allow Congress slowly and incrementally to arrogate to itself powers appropriately located elsewhere in our delicately balanced system of checks and balances. As the Supreme Court has warned, “[t]he hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted.” INS v. Chadha, 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983).[8]
II
While I disagree with the majority’s conclusion that Congress can constitutionally extend an incumbent’s term, I concur in the judgment because I conclude that Judge King was still authorized to exercise jurisdiction over the Bennys’ bankruptcy proceeding. Judge King was originally appointed to a six-year term in 1975. According to my analysis, once that term expired in 1981, he continued to sit as a holdover according to the terms of his original appointment. A holdover remains in office until he is displaced by a newly appointed successor. As Judge King was not so displaced, he remained in office as a holdover through October 1986 when he was validly reappointed to a new term by the Ninth Circuit. Congress’ attempts between 1978 and 1984 to grant Judge King greater job security by extending his fixed term in office failed because they violated the Appointments Clause. Although these attempts did not extend his tenure, neither did they extinguish his holdover status. Indeed, their only constitutional effect was to modify the duties of Judge King’s office.[9] Therefore, because Judge King continued to sit in office as a holdover from 1981 until his valid reappointment, he properly exercised jurisdiction over the Bennys’ bankruptcy proceeding.
*1147 A
Under the statutes in effect when Judge King was originally appointed to serve a six-year term starting on December 1, 1975, he was authorized to continue sitting in office as a holdover at the end of his fixed term. Specifically, section 34(a) of the Bankruptcy Act of 1898, as amended,[10] provided that “[u]pon expiration of his term, a referee in bankruptcy shall continue to perform the duties of his office until his successor is appointed and qualifies. ...”[11] U.S.C.A. § 62(a) (West 1968). After his fixed term expired on December I, 1981, he therefore served at the pleasure of the designated appointing authority because he could have been displaced at any time by the appointment of a successor.[11]
Starting in 1978, Congress purported several times to extend Judge King’s fixed term of office which was originally scheduled to expire in December 1981. As the majority explains in some detail, section 404(b) of the 1978 Act purported to extend his fixed term until March 31, 1984. The series of four Extension Acts purported to extend his fixed term further, first until April 30,1984, then until May 25, then until June 20, and finally until June 27. On July 10, the 1984 Act took effect. Section 121(b) of that Act purported to extend retroactively his fixed term from June 28 until July 9, and section 106(a) of that Act purported to extend prospectively his fixed term until October 1, 1986.
Because in my view all of these congressional attempts to extend the fixed terms of incumbent judges violated the Appointments Clause, they failed to extend the terms of incumbents like Judge King. As a result of this failure, he became a holdover on December 1, 1981, when his original fixed term expired. And his holdover status was never terminated by the appointment of a successor before he was reappointed by the Ninth Circuit to a new fixed term in 1986. As long as his holdover status was not terminated for some other reason, Judge King could still exercise jurisdiction over the Bennys' bankruptcy proceeding despite the unconstitutionality of Congress’ multiple attempts to grant him greater job security. It is therefore necessary to consider whether his holdover status continued throughout the period between the end of his fixed term in 1981 and his reappointment in 1986.
B
The Department of Justice posits two independent reasons why Judge King’s holdover status was terminated by operation of law before he presided over the Bennys’ proceeding. First, the Department contends that in 1984 Congress repealed the holdover provisions previously attaching to the terms of incumbent judges. Second, the Department contends that the underlying office of bankruptcy judge expired on June 28, 1984 and that this expiration of the office necessarily ended the tenure of all officeholders, including holdovers.[12] I consider each of these contentions in turn.
1
The Department argues that two different statutes passed by Congress in 1984 operated to repeal the holdover provision that originally attached to Judge King’s six-year fixed term. The Department initially focuses on the first of the series of Extension Acts which was enacted on March 31,1984. The Department suggests that Congress’ failure to provide specifically for a new holdover provision constituted an implied repeal of all earlier holdover provisions. Brief for the Intervenor-Appellant United States of America, at 21-23. Next, the Department contends that *1148 section 114 of the 1984 Act,[13] passed on July 10, 1984, expressly repealed the holdover provisions contained in section 404(b) of the 1978 Act.[14] Id. at 27 n. 16. According to these two statutory interpretations, Judge King’s holdover status was terminated by operation of statute, either on March 31 or on July 10, 1984.
There are two independent reasons why I disagree with the Department’s contention that Judge King’s holdover status was implicitly or explicitly terminated by Congress. First, any attempt to terminate the incumbents’ holdover status cannot be severed from Congress’ simultaneous attempt to extend the fixed terms of incumbents.[15] Congress unquestionably intended any repeal of existing holdover provisions to operate in conjunction with the initial Extension Act’s extensions of new fixed terms for a month and the 1984 Act’s extension of new fixed terms for a period of two to four years. Like the majority, I believe that Congress desired to maintain a smooth transition of bankruptcy judges from the pre-1978 statutory scheme to the 1984 scheme. See Majority Opinion at 1138. Surely Congress would not have intended to terminate the incumbents’ holdover status without simultaneously extending their fixed terms, as this would have brought the bankruptcy courts to a halt. Put another way, had Congress known that its extension of fixed terms would be ruled unconstitutional, its will plainly would have been that the incumbents remain in office as holdovers to ensure continuity. I therefore conclude that any attempt in either the first Extension Act or section 114 to repeal the prior holdover provision cannot be severed from Congress’ attempt to extend the incumbents’ fixed terms. Accordingly, a declaration that the extensions are unconstitutional also requires a declaration that any implied or express repeal of the holdover provision applicable to incumbent judges is void as well.
My second reason for disagreeing with the Department's position that Congress in 1984 impliedly or explicitly repealed the prior holdover provision is that any attempt by Congress to terminate the holdover tenure of incumbent judges would itself have constituted an independent constitutional violation. Once Congress has created an office with a specified term and that office has been filled by the designated appointing authority, Congress can terminate the officeholder’s tenure only by abolishing the underlying office; it cannot maintain the office but unilaterally remove the officer. Elimination of a judge’s holdover status, no less than the premature termination of a judge’s fixed term, would constitute a congressional removal of a non-legislative officer of the United States — a clear violation of the principle of separation of powers. See Bowsher v. Synar, — U.S. —, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (congressional removal of executive officers is unconstitutional). Therefore, any attempt in either the first Extension Act or section 114 of the 1984 Act to repeal the existing holdover provision “is a nullity and, therefore, powerless to work any change in the existing statute....” Frost v. Corporation Commission of Oklahoma, 278 U.S. 515, 526-27, 49 S.Ct. 235, 239-40, 73 L.Ed. 483 (1929).
In sum, I reject the Department of Justice’s claim that either the first Extension Act or section 114 of the 1984 Act impliedly or explicitly terminated Judge King’s holdover tenure and deprived him of jurisdiction to preside over the Bennys’ bankruptcy proceeding.
*1149 2
The Department posits a second reason why Judge King’s holdover tenure was terminated by operation of law. It contends that the underlying office of bankruptcy judge expired on June 28, 1984 after the four legislative extensions of the 1978 Act’s transitional provisions ran out. If this was so, then the abolition of the courts did indeed oust all judges, whether serving fixed terms or as holdovers, from office. It would follow that Judge King could not sit as a holdover after June 27, 1984.
1 reject this argument because I agree with the appellees that the underlying office of bankruptcy judge never terminated. Joint Brief for Appellees John M. England, Trustee, and United States Senate, at 21-15. The 1978 Act’s transitional provisions were originally designed to operate until April 1, 1984, after which the Act’s permanent provisions would come into effect. Each Extension Act delayed the date that the transitional provisions expired, the last such Act extending the termination date to June 27,1984. When the transition period expired on that date, the bankruptcy courts did not somehow cease to exist; rather, the permanent provisions of the 1978 Act automatically came into effect. These permanent provisions, which continued in existence the underlying bankruptcy courts (albeit in modified form), remained in effect until July 10 when the 1984 Act’s provisions became operative.[16] Because the underlying office of bankruptcy judge never terminated, the holdover tenure of judges in Judge King’s position likewise never terminated.[17]
*1150 CONCLUSION
When Judge King’s original six-year term expired on December 1, 198Í, he lawfully became a holdover pursuant to the statutory scheme then in effect. Congress’ subsequent attempts to extend his fixed term violated the Appointments Clause. Nevertheless, nothing in Congress’ subsequent enactments operated to terminate either Judge King’s office or his holdover status. Throughout the entire period from 1981 to 1986 when Judge King was validly reappointed by the Ninth Circuit, he served at the pleasure of the designated appointing authority — the district courts until June 27, 1984, the President in conjunction with the Senate from then until July 10, 1984,[18] and then the Ninth Circuit thereafter. Be *1151 cause no successor was in fact appointed to replace him, he continued to sit as a holdover judge during the entire period. I therefore concur in the result that Judge King had jurisdiction to preside over the Bennys’ bankruptcy proceeding.[19]

. Pub.L. No. 98-353, 98 Stat. 333.

. Section 106(a) of the 1984 Act extended the , terms of sitting bankruptcy judges for up to four years, providing in pertinent part that "the term of office of a bankruptcy judge who is serving on the date of enactment of this Act is extended to and expires four years after the date such bankruptcy judge was last appointed to such office or on October 1, 1986, whichever is later." 98 Stat. 342.

. Many state courts have considered this issue under state constitutions and have reached the conclusion that legislative extension of an incumbent’s term violates state constitutional prohibitions on legislative appointments. See Richman v. Ligham, 22 N.J. 40, 123 A.2d 372 (1956); Board of Elections v. State ex rel. Schneider, 128 Ohio St. 273, 191 N.E. 115 (1934); O'Connor v. City of Fond Du Lac, 109 Wis. 253, 85 N.W. 327 (1901); State ex rel. Taylor v. Mount, 151 Ind. 679, 51 N.E. 417 (1898); People ex rel. Lovett v. Randall, 151 N.Y. 497, 45 N.E. 841 (1897). See generally H.R.Rep. No. 595, 95th Cong., 1st Sess. 76-77, reprinted in 1978 U.S.Code Cong. & Ad. News 5963, 6037-38 (appendix) (letter of Professor Lucas from the University of Chicago) (expressing the opinion that Congress violated the Appointments Clause in 1978 by extending the terms of sitting bankruptcy referees).

. Although the President could veto any congressional act extending the terms of incumbents, Congress could override that veto with a two-thirds vote of both Houses. Thus if Congress could pass extension statutes it could by itself exercise an appointing authority. Cf. Bowsher v. Synar, — U.S. —, 106 S.Ct. 3181, 3189 n. 7, 92 L.Ed.2d 583 (1986) (statute empowering Congress to remove officers by joint resolution unconstitutionally vested removal power in Congress alone, even though the President could veto the resolution, because by overriding the veto Congress could remove officers in the face of Presidential opposition). Congress cannot, even by two-thirds vote, exercise nonlegislative powers.

. Although Congress cannot remove executive officeholders except by impeachment, Congress can impose limitations on the power of other branches to remove some officers, see Synar, 106 S.Ct. at 3187-89, particularly officers who do not exercise purely executive powers, such as quasi-judicial officers, see Humphrey’s Executor v. United States, 295 U.S. 602, 628-29, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935). Under the 1984 Act, bankruptcy judges may only be removed only for "incompetence, misconduct, neglect of duty or physical or mental disability." 28 U.S.C. § 152(e) (1984).

. As Alexander Hamilton wrote, the legislative branch, through the Senate, "may defeat one choice of the Executive, and oblige him to make another," but members of Congress "cannot themselves choose____” The Federalist No. 66, at 405 (New Amer. Library ed. 1961).

. The same reasons motivated Congress’ decision to extend the terms of sitting judges in *1145 1984. See Matter of Koerner, 800 F.2d 1358, 1364 n. 4 (5th Cir.1986); Appellees’ Brief at 43 n. 34.

. With respect to the majority's reference to the First Congress’ extension of the term of the first Postmaster General, I note my continuing objection to indiscriminate reliance on historical practice to justify the constitutionality of congressional or executive action. Where, as here, the historical record fails to indicate whether the First Congress considered that its action could violate the Constitution, no dispositive conclusions about the intent of the Framers can be drawn. See United States v. Woodley, 751 F.2d 1008, 1026 (9th Cir.1985) (Norris, J., dissenting). I also note the observations made by the Supreme Court in Myers v. United States, 272 U.S. 52, 170-71, 47 S.Ct. 21, 43-44, 71 L.Ed. 160 (1926) when it discounted the precedential value of past congressional action:
In the use of congressional legislation to support or change a particular construction of the Constitution by acquiescence, its weight for the purpose must depend not only upon the nature of the question, but also ... upon the number of instances in the execution of the law in which opportunity for objection in the courts or elsewhere is afforded. When instances which actually involve the question are- rare, or have not in fact occurred, the weight of the mere presence of acts on the statute book for a considerable time, as showing general acquiescence in the legislative assertion of a questioned power, is minimized.

. The office of bankruptcy judge (termed "bankruptcy referee” before 1978) underwent several changes from the time of Judge King’s original appointment in 1975 to his reappointment in 1986. The transitional provisions of the Bankruptcy Reform Act of 1978, the permanent provisions of that Act, and the 1984 Act all called for bankruptcy judges to exercise slightly different jurisdictional powers. However, none of these changes in the office’s duties were so extensive that “new” offices were created, which would require new appointments and preclude incumbents from continuing in office as holdovers. See Shoemaker v. United States, 147 U.S. 282, 300-01, 13 S.Ct. 361, 37 L.Ed. 170 (1893) (Congress can modify duties of office without requiring new appointment if new duties are reasonably germane to existing duties).

. 30 Stat. 544, amended by 65 Stat. 42 (1951) (codified as amended at 11 U.S.C. § 62(a) (West 1968)).

. Specifically, when he became a holdover in 1981 Judge King served at the pleasure of the district court for the district in which he sat, which had the statutory authority under the 1978 Act's transitional provisions to appoint his successor. Bankruptcy Reform Act of 1978, § 404(d), 92 Stat. 2684, incorporating § 34(a) of the 1898 Act, 11 U.S.C.A. § 62(a) (West 1968).

. Appellant Benny also makes this argument on appeal.

. 98 Stat. 343.

. Of course, because I believe that section 404(b) of the 1978 Act is unconstitutional, I find that Judge King was sitting as a holdover pursuant to the statutes in effect when he was appointed in 1975. See ante, at 1141. However, Congress mistakenly believed that Judge King’s holdover status was secured by section 404(b) of the 1978 Act, and therefore an attempted repeal of that section must be understood as an attempted repeal of the holdover provision that was actually applicable, namely, section 34(a) of the 1898 Act. See ante at 1141.

. After declaring one provision of a statute unconstitutional, we must invalidate other provisions of the statute as well if "it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not....” Buckley, 424 U.S. at 108, 96 S.Ct. at 677.

. One of the 1978 Act’s permanent provisions apparently vested the power to appoint new bankruptcy judges in the President with advice and consent of the Senate. See §§ 201(a), 402(b) of the 1978 Act. Appellees argue that Congress intended this appointment power not to vest until Congress first passed separate legislation authorizing the creation of new judge-ships.' Appellees conclude that the President’s appointment power never vested and that therefore during the thirteen-day period no government entity could make new appointments. See Joint Brief for Appellees, at 24 n. 17, 28 n. 19. The majority apparently agrees with their argument. ' See Majority Opinion at 1138; See also Matter of Koerner, 800 F.2d 1358, 1366 (5th Cir.1986) ("Thus, during the thirteen days [in 1984] in which the incumbent judges were holdovers, no entity had the authority to make new appointments.”).
This conclusion indicates that the majority has overlooked the self-executing nature of the appointment power established by Article II: even if appellees’ statutory interpretation is correct, the President still had the power, in conjunction with the Senate, to appoint new bankruptcy judges by direct operation of the Appointments Clause. The Appointments Clause states clearly that the President shall have the power to nominate (and the Senate to confirm) all inferior officers of the United States “but that Congress may by Law vest the Appointment of such inferior Officers” in other designated government entities. U.S. Const, art. II, § 2, cl. 2 (emphasis added). Therefore, the President, with advice and consent of the Senate, can appoint inferior nonlegislative officers unless Congress has explicitly empowered another appointing authority. If an office exists and at any point in time Congress does not vest the appointment power elsewhere, then it automatically lies with the President. Either by operation of statute or by direct operation of the Constitution, therefore, the President could have appointed, with advice and consent of the Senate, new bankruptcy judges to replace holdovers between June 27 and July 10, 1984.
I note that, had the President actually attempted to exercise his power of appointment to replace judges sitting as holdovers during this thirteen-day period, the role of the Senate in confirming or rejecting the President’s nominee might itself have presented an interesting constitutional question. In theory, the Senate could by itself block the appointment of new judges simply by withholding consent to the President’s choice. This would have the effect of keeping the incumbent holdover judge in office until such time as the President nominated a new judge who was even more attractive to the Senate than the incumbent. This role in de facto extending the holdover’s term might itself violate the Appointments Clause, as the Senate could dictate who remained in office. See ante at 1138. If so, the existence of holdover terms would be incompatible with the Senate’s participation in the appointment process.
I need not resolve this curious constitutional question here. The President did not in fact attempt to appoint any new bankruptcy judges during the thirteen-day period before the 1984 Act vested the entire appointment power in the Circuit Courts of Appeals, and therefore the Senate did not in fact find itself in a position to control the makeup of the bankruptcy judge-ships.

. The majority provides a fundamentally different answer to the appellants’ contention that the bankruptcy courts terminated on June 27, 1984. The majority holds that Congress’ provision for holdovers in the Extension Acts after the ending date of June 27, 1984 means by *1150 implication that Congress intended to continue the office of bankruptcy judge until it established an entirely new bankruptcy system, apparently under the transitional provisions of the 1978 Act. See Majority Opinion, at 1141. I cannot endorse this interpretation of the Extension Acts because it requires us to hold that Congress intended the last Extension Act to maintain the bankruptcy courts in perpetuity even though Congress unambiguously specified a June 27, 1984 expiration date for the courts’ operation. Publ.L. 98-325 §§ 1(b), 2, 98 Stat. 268 (1984). While we must construe language in light of congressional intent when that language is ambiguous, we cannot simply ignore clear language to save Congress from its own errors.
The majority holds in the alternative that even if the extension of the bankruptcy courts cannot be implied from the holdover terms of the bankruptcy judges, section 121(b) of the 1984 Act retroactively closed any gap in the bankruptcy courts that existed from June 27 to July 10. While this interpretation is more fair to the statutory language, I have difficulty endorsing it for other reasons. First, giving retroactive effect to a statute redefining the substantive law governing the past raises a novel and intriguing constitutional concern — it allows a subsequent Congress to nullify the legislative power properly exercised by a previous Congress. This runs counter to the principle underlying our democratic form of government that "popular sovereignty remains constant through time” which requires that the "legislature as delegatee of popular sovereignty has ... at every moment exactly the same freedom to act on its idea of the public good.” Kahn, Gramm — Rudman and the Capacity of Congress to Control the Future, 13 HAST. CONST. L.Q. 185, 199 (1986).
Moreover, retroactive application of the kind of provision at issue here raises a more specific separation of powers concern. If Congress can retroactively alter the decisionmaking authority of nonlegislative offices, it can manipulate the decisions of government entities which should be independent from its control. If a Congress did not like the decisions made by a particular agency during a previous time period, it could retroactively provide that the authority for making those decisions really lay elsewhere during that period and that therefore the actions actually taken by the agency have no force of law. Not only would this allow the legislative branch to threaten seriously the independence of other
branches of government, but it would greatly destabilize government agencies, as they could never know in advance whether their actions and decisions would be nullified by retroactive application of subsequent congressional actions. The Supreme Court has upheld the retroactive application of some legislative enactments against due process challenges. See, e.g., United States v. Darusmont, 449 U.S. 292, 101 S.Ct. 549, 66 L.Ed.2d 513 (1981) (rejecting due process challenge to retroactive application of amendments to Internal Revenue Code). To my knowledge, however, the Court has never addressed the separation of powers concerns with retroactivity that I have mentioned here. Without fully analyzing or resolving these questions, I simply note that the majority’s alternative explanation for why the bankruptcy courts never terminated raises as many difficult constitutional questions as it purports to answer.

. When Congress attempted in the 1984 Act to extend retroactively the operation of the transitional provisions of the 1978 Act all the way until July 10, 1984, it apparently extended the transitional provision authorizing the district courts to appoint new bankruptcy judges as well. Granting retroactive effect to section 121(b), in addition to raising general separation of powers problems, see supra 1139, note 4 also raises Appointments Clause concerns as well. Suppose on July 5 the President had nominated and the Senate had confirmed a new bankruptcy judge to fill an office then staffed by a holdover. If Congress’ retroactive vesting of the appointment power in the district courts instead of the President operates to nullify the President’s appointment, then Congress would in effect have removed an appointed judge in violation of the constitutional limits on its removal powers. See ante at 1141. And, if both the President and the district courts had nominated a judge to fill the same vacancy, then retroactive application of section 121(b) would additionally allow Congress to select the replacement judge in violation of the Appointments Clause. Because it appears that no government entity nominated or appointed any judges between June 27 and July 10, these concerns did not surface here. I simply note that such concerns provide additional reasons why we should be very hesitant to give effect to retroactive amendments without more fully analyzing the problems presented by retroactivity.

. At the time of this writing there are still some bankruptcy judges who according to my analysis are sitting as holdovers rather than under the fixed terms purportedly granted them by the 1984 Act and who, unlike Judge King, have not been reappointed to fourteen-year terms by the Courts of Appeals. As holdovers, these judges are currently subject to displacement at any time by appointment of a successor.