SUPREME COURT OF NEW JERSEY
R-3 September Term 2021

In the Matter of Establishment
of Congressional Districts by
the New Jersey Redistricting
Commission,

Douglas Steinhardt, in his official
capacity as Delegation Chair and Member of
the New Jersey Redistricting Commission,
Michele Albano, in her official capacity
as Member of the New Jersey Redistricting
Commission, Jeanne Ashmore, in her
official capacity as Member of the New Jersey
Redistricting Commission, Mark
Duffy, in his official capacity as Member of
the New Jersey Redistricting Commission,
Mark LoGrippo, in his official capacity
as Member of the New Jersey Redistricting
Commission, and Lynda Pagliughi, in
her official capacity as Member of the New
Jersey Redistricting Commission,
    Plaintiffs,
       v.
New Jersey Redistricting
Commission, John E. Wallace, Jr., in
his official capacity as Chair and Member of
the New Jersey Redistricting Commission,
Janice Fuller, in her official capacity as
Delegation Chairwoman and Member of the
New Jersey Redistricting Commission, Iris
Delgado, in her official capacity as
Member of the New Jersey Redistricting
Commission, Vin Gopal, in his official
capacity as Member of the New Jersey
Redistricting Commission, Stephanie
Lagos, in her official capacity as Member
of the New Jersey Redistricting Commission,

Jeff Nash, in his official capacity as
Member of the New Jersey Redistricting
Commission, Dana Redd, in her official
capacity as Member of the New Jersey
Redistricting Commission, and Tahesha
Way, in her official capacity as New Jersey
Secretary of State,
      Defendants.


1. This matter involves a legal challenge to the congressional redistricting map selected by the New Jersey Congressional Redistricting Commission (Commission).

*Selection of Commission members and redistricting process*

2. The State's political leaders appoint the members of the Commission. Under the State Constitution, the following individuals each appoint two members: the President of the Senate and Speaker of the Assembly; the minority leaders of the Senate and Assembly; and the chairs of the State committees of the political parties whose candidates received the largest or next largest number of votes in the most recent election for Governor. N.J. Const. art. II, § 2, ¶ 1(b). As a result, the Commission is initially comprised of six individuals affiliated with the Democratic Party and six who are affiliated with the Republican Party.

3. The Constitution also provides for an independent thirteenth member. Id. ¶ 1(c). Because the original twelve members were unable to agree on a

2

proposed tiebreaker by a majority vote, each delegation submitted one name to the Court. From those names, the Court had to select the thirteenth member, in accordance with the Constitution. Ibid.

4. The Constitution sets forth two qualifications for the independent member: the individual must have been a New Jersey resident for the past five years and, during that period, "shall not . . . have held public or party office in this State." Ibid. The Constitution also provides a standard for the selection of the independent member. It calls upon the Court to select, by a majority vote, the person "more qualified by education and occupational experience, by prior public service in government or otherwise, and by demonstrated ability to represent the best interest of the people of this State." Ibid. From the two names presented, the Court selected the Honorable John E. Wallace, Jr. (ret.), to serve as the independent member. Neither party objected to his selection. The independent member serves as Chair of the Commission. Id. ¶ 2.

5. The Commission must hold at least three public hearings. Id. ¶ 4. In this case, it held ten hearings, virtually and in-person, at which it heard testimony from the public. The Commission also received written submissions and draft maps from the public.

6. The process that follows is intensely political, not legal, which reflects the makeup of the Commission and the nature of its work. The

3

Commission is essentially a political body, comprised mostly of partisan appointees, that fixes boundaries for election districts. See Gaffney v. Cummings, 412 U.S. 735, 753 (1973) ("Politics and political considerations are inseparable from districting and apportionment.").

7. Historically, after meeting in private with the respective partisan delegations to discuss their proposals, the independent member serves as the tiebreaker and selects one party's preferred map. The outcome commonly garners praise from one party and criticism from the other. This redistricting cycle was no different.

8. On December 22, 2021, a majority of the Commission's members that included the Chair voted in favor of the map the Democratic delegation presented. Plaintiffs, the Republican delegation to the Commission, filed an amended complaint on January 5, 2022 to challenge that map. Plaintiffs filed their complaint directly with this Court, pursuant to Article II, Section 2, Paragraph 7 of the Constitution.

*Plaintiffs' challenge*

9. Plaintiffs ask the Court to vacate the Commission's decision and remand the matter to the Commission for further proceedings, with the Chair, Justice Wallace, recused. Defendants, the Democratic delegation to the Commission, filed a motion to dismiss the amended complaint. Among other

4

arguments, defendants assert that the amended complaint fails to state a claim upon which relief can be granted.

10. Plaintiffs' arguments rest to a large extent on the rationale offered by the Chair to explain his vote in support of the Democratic delegation's map. The Chair provided reasons for his vote at the Commission's final meeting on December 22, 2021. He also amplified his reasoning in writing, on January 11, 2022, in response to a request from the Court.

11. This Court has no role in the outcome of the redistricting process unless the map is "unlawful." N.J. Const. art. II, § 2, ¶¶ 7, 9. If it is, the Commission must reassemble and adopt another redistricting plan. Id. ¶ 9.

*Legal standard*

12. In 1974, before the current constitutional process was adopted, the Court noted that reapportionment plans "must be accorded a presumption of legality with judicial intervention warranted only if some positive showing of invidious discrimination or other constitutional deficiency is made. The judiciary is not justified in striking down a plan, otherwise valid, because a 'better' one, in its opinion, could be drawn." Davenport v. Apportionment Comm'n, 65 N.J. 125, 135 (1974) (citing Gaffney).

5

13. That stringent standard still applies. It is not the Court's task to decide whether one map is fairer or better than another.[1] We review redistricting plans only to determine if the map selected is "unlawful." N.J. Const. art. II, § 2, ¶ 9. So long as the final map is constitutional, the Court cannot grant any relief.

14. Plaintiffs claim the actions of the Chair were "arbitrary, capricious, and unreasonable," presented violations of "federal and state constitutional equal protection and due process protections," and posed a "common law conflict of interest." Am. Compl. ¶¶ 7, 8, 101. The complaint also asserts there were "significant differences between the maps" and sets forth ways in which the Republican delegation's map better met the standards the Chair had applied. Id. ¶¶ 49-56. Plaintiffs' complaint, however, does not assert that the map the Commission adopted -- which the Democratic delegation and the Chair voted for -- was itself "unlawful."

---

[1] Only if neither map receives seven votes from the members of the Commission does the Supreme Court choose between two competing maps. N.J. Const. art. II, § 2, ¶ 3. In that case, the Court must select the map that "conforms most closely to the requirements of the Constitution and laws of the United States." Ibid.

*Threshold arguments*

15. Defendants contend that plaintiffs -- the Republican members of the Commission who brought suit in their official capacity -- lack standing because they have no "personal stake" and have not alleged a "personal injury." Instead, defendants contend plaintiffs have only an institutional interest that does not afford them standing any more than it would the minority side of a legislative body that lost a vote on an ordinance or bill.

16. Our jurisprudence takes a more liberal approach to standing than federal law. See In re Camden County, 170 N.J. 439, 448 (2002); see also Jen Elec., Inc. v. County of Essex, 197 N.J. 627, 645 (2009). The State Constitution does not limit "our judicial power to actual cases and controversies." Camden County, 170 N.J. at 448 (quoting Crescent Park Tenants Ass'n v. Realty Equities Corp. of N.Y., 58 N.J. 98, 107-08 (1971)). At the same time, courts do not render advisory opinions or "entertain . . . plaintiffs who are 'mere intermeddlers,' or are merely interlopers or strangers to the dispute." Id. at 449 (omission in original) (quoting Crescent Park, 58 N.J. at 107).

17. To possess standing in state court, a party must have "a sufficient stake in the outcome of the litigation" and "real adverseness," and there must be "a substantial likelihood that the party will suffer harm in the event of an

7

unfavorable decision." Camden County, 170 N.J. at 449; Jen Elec., Inc., 197 N.J. at 645. We also give weight to the public's interest in the resolution of a matter and favor a just ruling on the merits over "procedural frustrations."[2] Crescent Park, 58 N.J. at 107-08; see also Pressler & Verniero, Current N.J. Court Rules, cmt. 2.1 on R. 4:26-1 (2022).

18. Plaintiffs have a strong stake in the outcome of the redistricting process and are plainly adverse to the map adopted. Their assertion of personal harm as members of the delegation is less strong, but the overriding public interest in this case is compelling. Resolving the map for congressional districts for the next decade is of the utmost importance. Doing so expeditiously, in time for candidates and election officials to plan for the upcoming primary and general elections, is also significant to the public. We therefore consider the merits.

---

[2] Here, for example, the complaint could be amended, or possibly refiled, with plaintiffs or others listed as residents of New Jersey and not just in an official capacity. See R. 4:9-1 (noting that pleadings may be amended as a matter of right and "by leave of court which shall be freely given in the interest of justice"); cf. Brady v. N.J. Redistricting Comm'n, 131 N.J. 594, 605 (1992) (addressing congressional redistricting challenges brought by residents and taxpayers). If the complaint were amended in that way, there would be no prejudice to defendants. See Notte v. Merchs. Mut. Ins. Co., 185 N.J. 490, 501 (2006).

19.  Defendants raise an additional threshold argument that the complaint must be dismissed because it presents a nonjusticiable political question.  That issue "is primarily a function of the separation of powers." Gilbert v. Gladden, 87 N.J. 275, 281 (1981) (quoting Baker v. Carr, 369 U.S. 186, 210 (1962)).  To determine whether an issue poses a nonjusticiable political question, courts consider, among other factors, if there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department."  Id. at 282 (quoting Baker, 369 U.S. at 217).  Here, the Constitution grants the Supreme Court "jurisdiction over any judicial proceeding challenging . . . any action, including the establishment of Congressional districts, by the commission."  N.J. Const. art. II, § 2, ¶ 7.  The Court's narrow role in that regard -- limited to challenges over whether a map is unlawful -- avoids political questions that could be raised by a review of the Commission's decisions.

20.  Plaintiffs raise a threshold argument as well and contend that the Chair's amplified statement of reasons cannot be considered because it violates the State Constitution's public meeting requirement and analogous principles in the Open Public Meetings Act (OPMA), N.J.S.A. 10:4-6 to -21.  To repeat, on January 4, 2022, the Court requested an amplified statement of reasons to assist in its review of this matter.  By analogy to Rule 2:5-1(b), which allows a

9

trial judge or agency head to submit "an amplification of a prior statement, opinion or memorandum" when an appeal is taken, the Court asked the Chair to amplify the grounds for his oral decision on December 22, 2021. The Chair presented a written statement to the Court and the parties on January 11, 2022, and it was posted on the Judiciary's website the same day. Response to Order of Jan. 4, 2022, https://www.njcourts.gov/courts/assets/supreme/ ResponseCongressional1-21.pdf?c=avq.

21. In light of the challenges plaintiffs assert and the limited nature of our review of the Commission's work, we do not rely on the Chair's amplified statement. Plaintiffs' argument is therefore moot.[3]

---

[3] We note that the Constitution's meeting requirement does not apply to the Chair's supplemental statement. The Constitution directs that the Commission "certify the establishment of [congressional] districts pursuant to a majority vote of the full authorized membership of the commission convened in open public meeting, of which meeting there shall be at least 24 hours' public notice." N.J. Const. art. II, § 2, ¶ 3 (emphasis added). As noted earlier, the Constitution also requires the Commission to "hold at least three public hearings in different parts of the State." Id. ¶ 4. Except for those two types of proceedings -- the requisite public hearings and the meeting to certify the establishment of districts -- meetings of the Commission "may be closed to the public." Id. ¶ 5.

The meeting to certify congressional districts took place on December 22, 2021, when the full Commission voted on and adopted a map, at an open public meeting. The Chair's supplemental statement did not certify a congressional map, which no single member could have accomplished.

Furthermore, OPMA does not apply to the work of the Commission. Nor does the statute apply to the State's legislative redistricting process.

10

_Statements and findings by the Chair_

22.  Here, the Chair concluded that both maps were constitutional.  On December 22, 2021, he first orally outlined certain factors that guided his determination:  that "congressional districts . . . shall be geographically contiguous" and account for each district's total population; that "[m]apmakers shall comply with the Voting Rights Act" and other relevant authority, and "should include sufficient numbers of minority/majority districts"; that maps "shall not split political subdivision boundaries and communities of interest unless necessary" to comply with the above standards; that "[c]ompetitive districts are favored"; that "[n]o district may be formed solely to favor or disfavor any political party or the election of any person" (which the Chair described as "partisan fairness"); that "districts may include the cores of existing districts" "[to] assist voters in assessing incumbents and minimizing voter confusion"; and that "[a]ll districts shall be as compact and regularly shaped as possible unless deviation is required to comply with any of the

---

N.J.S.A. 10:4-8(a).  The public meeting requirements for the Commission are spelled out in the Constitution.  Under the Commission's by-laws, notice for required public meetings shall be given in accordance with the Constitution and OPMA, "notwithstanding the OPMA's inapplicability to the Commission." See Redistricting Commission By-Laws art. IV, ¶ 6.  The Chair's submission of a supplemental statement was not a required public hearing or a meeting to certify the establishment of districts under the Constitution.

11

above standards." Plaintiffs' complaint does not challenge the map for any of those reasons.

23. The Chair then found that both maps satisfied the above standards with one exception: "The only area where one map pulled ahead of the other is in partisan fairness." As the Chair explained,

> Both maps were evaluated by my team using various statewide tests for partisan fairness. Without getting into the details of the tests, I simply state that the results showed that the partisan fairness would favor the Democratic[] map. However, because neither delegation used these tests, I have decided not to give any weight to them in making my decision.

The Chair next added,

> In summary, both delegations aptly applied our standards to their map. In the end, I decided to vote for the Democratic map, simply because in the last redistricting map it was drawn by the Republicans.

> Thus, I conclude that fairness dictates that the Democrats have the opportunity to have their map used for this next redistricting cycle. Thank you. That concludes my comments.

We do not rely on the above statement to resolve plaintiff's claims, which do not challenge the constitutionality of the map.

24. In an amplified statement of reasons on January 11, 2022, the Chair reiterated his belief that both maps were constitutional and met the standards he had previously outlined. Although we do not rely on the amplified

12

statement, we include a part of it for completeness. The Chair stated "that the Democrats' map better satisfied the standard for Partisan Fairness." In his words,

> Many tests for Partisan Fairness are accepted by the social science community. They fall into two broad categories, a category based on partisan symmetry and a category based on geography.
>
> Tests of partisan symmetry have their roots in a simple and intuitive concept of fairness: what would happen if the tables were turned? Social scientists have overwhelmingly endorsed such a concept. For example, in the ideal case, given the same statewide electoral totals, each side should win the same number of seats. Using such mathematical tests, my team determined that the Democratic plan shows superior partisan symmetry to the Republican plan.
>
> The second category of test is to use the natural geography of the state. Modern technology allows hundreds of thousands of alternative plans to be drawn automatically, providing a way to determine what a "natural" outcome would be if plans were drawn in a party-blind manner generally following the required redistricting standards. Such an approach is called the ensemble comparison method, and is used by state courts to evaluate partisan gerrymandering claims. My team found that the Democratic plan is closer to the average of the ensemble than the Republican plan, and therefore is more "party-blind."

25. In addition, the Chair explained that had his team informed the delegations that it would use the above tests to evaluate their maps, "I would have stated that Standard 5 for Partisan Fairness tipped the scales in favor of

13

the Democrats' map." The Chair added that, "[u]pon reflection, I realize I mistakenly failed to consider . . . Partisan Fairness of the maps" and "should have stated that the Democrats' map better satisfied the standard. . . . I do that at this time."

*Substantive challenges*

26. Reasonable people may differ with a tiebreaker's evaluation of, and support for, a particular plan, but that decision is not subject to review by the Court unless the plan is unlawful or reflects invidious discrimination. N.J. Const. art. II, § 2, ¶ 9; Davenport, 65 N.J. at 135. No count in the complaint, however, asserts that the final map itself is unlawful or that it is the result of invidious discrimination.

27. Plaintiffs' arguments instead center on the tiebreaker's reasons in support of his vote. In their complaint, plaintiffs assert the Commission's "adoption of the Democratic map . . . must be set aside . . . because its adoption was based upon an arbitrary, capricious, and unreasonable vote and reasoning by Chair Wallace." Am. Compl. ¶ 77. Plaintiffs' brief similarly "challenges Chair Wallace's arbitrary, capricious, and unreasonable decision to select the Democratic map out of 'fairness' because the Republicans 'won' in the last redistricting cycle." According to plaintiffs, the adoption of a map based on the Chair's manner of decision and his vote violated their federal and

14

state procedural due process rights and constitutional due process protections. We briefly address each claim in turn, starting with procedural due process.

28. The due process clause of the Fourteenth Amendment states that no "State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, §1. Although the New Jersey Constitution does not articulate a "right to due process," Article I, Paragraph 1 has been interpreted to "protect[] 'values like those encompassed by the principle[] of due process.'" Doe v. Poritz, 142 N.J. 1, 99 (1995) (second alteration in original) (quoting Greenberg v. Kimmelman, 99 N.J. 552, 568 (1985)). "To examine a procedural due process claim, courts 'first assess whether a liberty or property interest has been interfered with by the State, and second, whether the procedures attendant upon that deprivation are constitutionally sufficient.'" State v. Robinson, 229 N.J. 44, 75 (2017) (quoting Doe, 142 N.J. at 99).

29. Plaintiffs' argument appears to rest on the use of the amplified statement. They claim they lacked notice and an opportunity to be heard, and that they were deprived of an opportunity to respond to the Chair's "ultimate reasons." Because we do not rely on either statement, that argument is moot. To the extent plaintiffs assert a broader claim, it does not allege how the plan is unlawful. See N.J. Const. art. II, § 2, ¶ 9; Davenport, 65 N.J. at 135. For

15

that reason alone, their argument fails. We note as well that, although plaintiffs cite generally to the fundamental right to vote, they do not offer persuasive authority that the State interfered with a liberty or property interest through the manner in which the Chair explained his decision.

30. Plaintiffs advance a related due process argument based on the doctrine of fundamental fairness. The doctrine protects against "unjust and arbitrary governmental action," in particular, government procedures that operate arbitrarily. State v. Njango, 247 N.J. 533, 548 (2021) (quoting Doe, 142 N.J. at 108). Courts apply the doctrine sparingly -- "in those rare cases where not to do so will subject the defendant to oppression, harassment, or egregious deprivation." Doe, 142 N.J. at 108 (quoting State v. Yoskowitz, 116 N.J. 679, 712 (1989) (Garibaldi, J., concurring and dissenting)).

31. That argument, as well, does not purport to establish that the map is unlawful. Plaintiffs' claim therefore cannot prevail. See N.J. Const. art. II, § 2, ¶ 9; Davenport, 65 N.J. at 135. In addition, the Constitution does not afford either partisan delegation a right to dispute or counter the independent member's decision. The vote marks the end of a political process. It follows days of private meetings and discussions in a hotel, with one side and then the other meeting with the Chair. Those discussions and their resolution are not

16

subject to procedural rules or judicial review in precisely the manner that an agency decision or a trial judge's ruling would be.

32. Plaintiffs also assert that the Court should apply the standard for agency review to redistricting decisions, and that the Chair's conclusion was arbitrary, capricious, and unreasonable.

(a) The traditional standard of review for actions of a public agency is whether the action was "arbitrary, capricious, or unreasonable." Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018). Under that standard, reviewing courts consider

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;
>
> (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and
>
> (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Ibid. (quoting In re Stallworth, 208 N.J. 182, 194 (2011)); see also In re Request to Modify Prison Sentences, 242 N.J. 357, 390 (2020).]

Courts also assess whether the agency's action offends the Federal or State Constitutions. In re Eastwick Coll. LPN-to-RN Bridge Program, 225 N.J. 533, 541 (2016).

17

(b) This challenge likewise fails because it, too, does not allege how the redistricting plan is unlawful. See N.J. Const. art. II, § 2, ¶ 9; Davenport, 65 N.J. at 135. The argument is therefore beyond the limited scope of our review. We also note that the standard of review for an agency's action is not an ideal fit. There are no express or implied constitutional or legislative policies to guide the Commission's work. There is also no traditional record to measure any findings against because the key work of the Commission takes place behind closed doors with no record of its discussions.

33. In addition, plaintiffs submit the adoption of a map based upon the Chair's reasons violated their substantive due process protections. Relying on Winters v. Illinois State Board of Elections, 197 F. Supp. 2d 1110 (N.D. Ill. 2001), plaintiffs argue that the Chair's vote and the adoption of the map did not satisfy rational basis review.[4] Under that standard, a statute, typically, must bear a "rational relationship to a legitimate government goal." State in Interest of C.K., 233 N.J. 44, 73 (2018). The claim thus falls outside the

---

[4] In Winters, the district court assessed Illinois' practice of having the Secretary of State select the tiebreaker for congressional redistricting by randomly drawing one of two names, of people from different political parties, submitted by the State Supreme Court. 197 F. Supp. 2d at 1112. The district court upheld the practice because it was rationally related to a legitimate government interest -- giving the parties an incentive to compromise to avoid losing a random drawing. Id. at 1114-16.

18

limited nature of our review of redistricting decisions. Plaintiffs' argument focuses on the Chair's thought process but does not allege how the map suffers from invidious discrimination or is otherwise unlawful. See N.J. Const. art. II, § 2, ¶ 9; Davenport, 65 N.J. at 135.[5]

34. Plaintiffs submitted a second amended complaint on February 2, 2022. The newly amended complaint adds the Princeton Gerrymandering Project (PGP) as a defendant. Second Am. Compl. ¶ 27. According to plaintiffs, the group advised and provided independent analysis of the parties' proposed redistricting maps to the Chair during the redistricting process and breached an alleged promise of confidentiality by providing valuable feedback to the Democratic delegation. Id. ¶¶ 119-21. At the same time, however, plaintiffs acknowledge that during four days of discussions at a hotel in Cherry Hill, "Chair Wallace provided feedback to the Republican delegation (and presumably to the Democratic delegation as well), and the Republican delegation made changes to its proposed map based upon the comments from Chair Wallace." Id. ¶ 39. Plaintiffs also allege that PGP is supported by private donors who have contributed to Democratic officials and causes. Id. ¶¶

---

[5] Plaintiffs have not submitted argument in support of strict scrutiny review or their equal protection claim, so we do not consider either issue further.

19

115-18. Without citing a particular legal theory, plaintiffs assert judicial intervention is required to respond to a "tainted" process.

35. Like the allegations discussed above, plaintiffs' additional claim does not assert that the redistricting plan is unlawful or is the result of invidious discrimination. See N.J. Const. art. II, § 2, ¶ 9; Davenport, 65 N.J. at 135. The new argument, as well, falls outside the Court's limited scope of review in redistricting matters and therefore cannot prevail.

*Common law conflict of interest claim*

36. For the first time, plaintiffs now contend the Chair had a conflict of interest under the common law and should have recused himself because his wife made a political contribution to a member of Congress from New Jersey in 2021. Am. Compl. ¶ 102. That information is readily available to the public; it appears on the Federal Election Commission's (FEC's) public database of contributions to candidates and committees in federal elections. Fed. Election Comm'n, Individual Contributions, https://www.fec.gov/data/receipts/individual-contributions/?two_year_transaction_period=2022&min_date=01%2F01%2F2021&max_date=12%2F31%2F2022. Because plaintiffs either knew or reasonably should have known of the contribution, they could have raised the argument earlier. Instead, they did not object to the Chair's participation until after he selected the other side's map. On those

20

facts, a strong argument can be made that plaintiffs waived their conflict claim.

37. As noted earlier, the Constitution sets forth specific qualifications for the independent member: the individual must have been a New Jersey resident for the last five years and cannot "have held public or party office" in New Jersey during that time. N.J. Const. art. II, § 2, ¶ 1(c). Because the Constitution specifies requirements for the tiebreaker, we do not look to the common law, as plaintiffs request, to insert additional qualifications. Cf. DCPP v. J.R.-R., 248 N.J. 353, 373 (2021) (noting the Court has no authority to import a doctrine from the common law into the Legislature's statutory scheme); Coleman v. Martinez, 247 N.J. 319, 365 (2021) (Albin, J., dissenting) ("The common law persists in any field until occupied by the Legislature.").

38. The Constitution does not bar the selection of a person who has contributed to a political campaign or a partisan political group, or whose spouse has done so, as the independent member. See N.J. Const. art. II, § 2, ¶ 2. We therefore find no disqualifying conflict.

39. Defendants also submitted FEC records about political contributions that members of both partisan delegations made in the past two years. Nothing about the current system prevents that either.

40. The Commission fixes the boundaries for our State's congressional districts, which remain in place for a decade. It is vital that the public have confidence in the Commission's important work. Questions of partisanship or the appearance of partisanship can affect the public's confidence, yet our current system is designed to be overseen by twelve partisan members and a thirteenth member whom the party delegations propose. Two highly respected individuals were recommended for that role. But there are other ways to conduct the redistricting process.

41. A number of states, including California, Arizona, Michigan, and Colorado, have created independent redistricting commissions that include citizens with no party affiliation, in order to "increase the degree of separation between map-drawers and partisan politics." League of Women Voters of Ohio, ___ N.E.3d ___, ___ (2022) (slip op. 2022-Ohio-65, ¶ 143) (O'Connor, J., concurring) (citing Emily Rong Zhang, Bolstering Faith with Facts: Supporting Independent Redistricting Commissions with Redistricting Algorithms, 109 Calif. L. Rev. 987, 990, 1000 (2021)). Chief Justice O'Connor's concurring opinion in League of Women Voters succinctly outlines those models. Id. at ___ (slip op. ¶¶ 144-46). In general, partisan actors and officials have a more limited role in selecting members of independent redistricting commissions. See Bruce E. Cain, Redistricting

Commissions:  A Better Political Buffer?, 121 Yale L.J. 1808, 1818-19 (2012). Some models also require that individuals who are unaffiliated with a political party be part of redistricting commissions.  Cal. Const. art. XXI, § 2, ¶ (c)(2) (four out of fourteen members); Colo. Const. art. V, § 44.1, ¶¶ 8-10 (four out of twelve members); Mich. Const. art. IV, § 6, ¶ 2 (five out of thirteen members).

42.  The current redistricting process in New Jersey stems from an amendment to the Constitution in 1995, N.J. Const. art. II, § 2, which followed a statute enacted in 1992, L. 1991, c. 510 (expired 2001).  To change the system and distance it from partisan politics would require a proposed constitutional amendment and voter approval.  See N.J. Const. art. IX, ¶¶ 1, 4. Those decisions can begin with grassroots efforts, see Zhang, 109 Calif. L. Rev. at 1001, or the political branches of government.  In the end, the choice is left to the people of our State.

*Conclusion*

43.  Because plaintiffs' allegations are insufficient to support a claim upon which relief can be granted, see R. 4:6-2(e), defendants' motion to

23

dismiss the complaint with prejudice is granted.

For the Court

Stuart Rabner
Chief Justice

February 3, 2022

CHIEF JUSTICE RABNER; JUSTICES ALBIN, PATTERSON, and SOLOMON; and JUDGE FUENTES (temporarily assigned), join in the Order. JUSTICES FERNANDEZ-VINA and PIERRE-LOUIS did not participate.